**GENERAL DYNAMICS CORPORATION**
v.
**The UNITED STATES.**
**No. 161–66.**

United States Court of Claims.
May 16, 1969.

Gilbert A. Cuneo, Washington, D. C., attorney of record, for plaintiff; Sellers, Conner & Cuneo, Washington, D. C., H. Cushman Dow, Richard L. Peck and Ward W. Waddell, of counsel.

Edgar H. Twine, Washington, D. C., with whom was Asst. Atty. Gen. William D. Ruckelshaus, for defendant.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS, COLLINS, SKELTON and NICHOLS, Judges.

## OPINION *

SKELTON, Judge.

The plaintiff, a San Diego, California, based corporation, entered into a cost-plus-fixed-fee contract No. AF04(645)–4 with the United States, on or about January 14, 1955, for the research, development, manufacturing, and testing of the Atlas Intercontinental Ballistic Missile, which later became known as the ICBM's. The project was engaged in as a crash program so that the first missile could be fired in the spring of 1957. The undertaking was of such magnitude that by 1961 over one billion dollars had been incurred in costs and a fee of nearly six-ty-seven million dollars had been earned by the plaintiff contractor.

The plaintiff spent over twenty million dollars building a plant in San Diego, California, to manufacture the system. It became necessary for the plaintiff to build a missile flight facility at Cape Canaveral (later Cape Kennedy), Florida, from which the missiles could be launched and tested. This required it to move hundreds of its highly trained employees from California, to Cape Canaveral, Florida. It began its operations there in August 1955. However, most of the employees arrived at the Cape after January 1, 1956. The payroll records indicate that the number of employees at the Cape at different times were as follows:

| | |
|---|---|
| January 1956 | 9 |
| June 1956 | 44 |
| December 1956 | 206 |
| June 1957 | 580 |
| August 1957 | 695 |
| January 1960 | 1,113 |

In the summer of 1955, there was an acute housing shortage at the Cape. Also, there was no potable water supply, no sewage system, few paved roads, and poor schools. There was no FHA financing for houses and the available houses were in bad condition and the rents were high. The plaintiff tried unsuccessfully to interest private financiers and the FHA to finance the building of houses in the area. The plaintiff, as well as the government, had made housing surveys of the Cape and both were fully aware of the existing housing situation.

The plaintiff had planned at first to move only about 300 men to the Cape, but this plan was changed when it decided to have a permanent force there of about 900 men, with at least 300 of them in residence by the middle of 1957. The plaintiff viewed the housing shortage as critical. In September 1955, its opera-

---

* The case is before the court under the assignment of errors procedures from the decisions of the Armed Services Board of Contract Appeals. Plaintiff's Specification of Errors and Brief were filed December 2, 1966, pursuant to the trial commissioner's order of September 19, 1966. Such findings as are necessary to the opinion are set forth therein.

tion manager at the Cape, a Mr. Byron McNabb, recommended to plaintiff that the only solution was for it to go into the real estate business by building houses it could rent to its employees.

On January 11, 1956, the plaintiff wrote the Air Force at the Cape requesting contract coverage for leasing of permanent type housing, but the Air Force contracting officer refused to agree to it. On April 3, 1956, the contracting officer advised the plaintiff that "the contract does not allow for contractor provided housing at AFMTC [Air Force Missile Test Center]."

In the meantime, the government was attempting to remedy the housing situation in several ways. On June 6, 1956, it sent the plaintiff a telegram outlining its efforts in this regard, stating:

(1) It had signed a contract with the City of Cocoa for a water supply.

(2) It was supporting the Sparkman Bill in Congress to provide FHA mortgage insurance for housing.

(3) It was making an effort to get Capehart Housing for military personnel which would release other housing occupied by them.

(4) It was endeavoring to interest private builders to construct houses in the area.

The telegram further stated:

In consideration of actions possibly in progress, the Air Force plans no third party indemnity guarantees for housing requirements of contractor employees performing at AFMTC.

The plaintiff answered this telegram by a wire message on June 25, 1956, in which it disagreed with the government's telegram of June 6th.

On July 23, 1956, the government sent plaintiff the following telegram:

The Sparkman Bill became law on 13 June 1956—PL 574. The Department of Defense has issued a certificate to FHA for mortgage guarantee on 1000 houses under Sparkman Bill. Local FHA, Tampa Office, believes that in view of interest already indicated by builders in Sparkman program, that considerable construction will be started immediately. In addition, AFMTC has approval for 1125 houses under the Capehart Bill. Current estimate is April 1957 for first units to be completed * * *. We are firmly convinced that no additional action which the Government might take would result in obtaining housing sooner than the above Sparkman and Capehart actions. Although the housing situation will remain critical for several months, we cannot accept that it is critical to the extent that your program schedules cannot be maintained.

In the meantime, plaintiff had been negotiating with Whitmor Homebuilders, Inc., to build houses for its employees, and on August 9, 1956, it issued a letter of intent to this company, which was followed up on September 14, 1956, with the execution of a formal contract for the building of 130 houses. The first house was to be completed by December 15, 1956, and all of them by June 15, 1957. The contract provided that the houses would be leased to the plaintiff for twelve years at a stated monthly rental, with plaintiff having the option to buy them at any time with credit for all prior rent payments. The plaintiff proposed to rent or sell the houses without profit to its employees. Construction was not started, however, until February 1957, with the first house being finished in May and the last one in August of that year.

By the time these houses were started in February 1957, water had become available and also the Sparkman Act provided FHA financing. This caused private builders to become interested in the area and they started building houses before the plaintiff's houses were started, and began renting them cheaper than plaintiff could rent its houses. As a consequence, plaintiff could not rent or sell many of its houses.

On March 7, 1957, at the beginning of the construction of plaintiff's 130 houses, the contracting officer asked plaintiff to concur in the contracting officer's understanding that no costs in connection with

the housing project would be charged directly or indirectly to the government under the contract. The plaintiff replied by letter of April 17, 1957, refusing to agree to the contracting officer's request.

It should be pointed out that on October 19, 1956, the Air Force wrote the plaintiff that it intended to discontinue making bonus payments to plaintiff's employees at the Cape. The plaintiff's president wrote a letter protesting this action in which he said:

Convair therefore recommended many months ago that it be permitted to have additional housing built under a lease arrangement whereby non-occupancy costs would be guaranteed by Convair and reimbursed by the Government. Repeated refusals by the Government to guarantee the non-occupancy costs finally forced Convair to enter into the development of housing *as a private venture* entirely unrelated to its established areas of business activity. So as to minimize the impact of this venture on its capital resources, Convair has succeeded in having the houses financed by other private resources but for a relatively short term of twelve years. In order to amortize construction costs over that period, it will be necessary to charge Convair's employees monthly rentals considerably in excess of what they are accustomed to pay. From a company standpoint, Convair hopes to sell these houses to its employees. However, the extent to which they are able to afford to rent or to buy these houses will be determined fundamentally upon their receiving remuneration in excess of that paid them here at their home location. [Emphasis in original.]

The Air Force decided not to cut off the bonus payments.

The plaintiff finally sold all of its houses for a total price in excess of their cost, but because of having paid high rentals over a long period of time, and other expenses, it sustained a loss on the project of $409,429.15. In due time, it presented a claim to the contracting officer in this amount on the theory that it was an allowable cost under the contract. The contracting officer denied the claim on July 12, 1961, saying:

a. The costs are not contractually covered.

b. The costs have been found to be of a type not necessary for the conduct of the contractor's business or the performance of the contract, and are therefore considered unallowable in accordance with Part 2, Section XV of the Armed Services Procurement Regulation.

The plaintiff appealed to the Armed Services Board of Contract Appeals, hereinafter called the Board.[1] The Board's decision upheld the denial of the claim by the contracting officer on March 12, 1963, and denied plaintiff's motion for reconsideration on May 14, 1963. Thereafter, the plaintiff filed suit in this court.

The case is before us for review under the Wunderlich Act, 68 Stat. 81, 41 U.S.C. §§ 321–322 (1964). The defendant contends that the decision of the Board is final, conclusive and binding on the parties pursuant to the disputes clause of the contract and under the provisions of the Wunderlich Act because the decision is supported by substantial evidence and is neither arbitrary, capricious, or so grossly erroneous as to imply bad faith.

The plaintiff contends that the decision of the Board was arbitrary and capricious and is not supported by substantial evidence and is erroneous in law.

The pertinent parts of the contract which govern the decision in this case are as follows:

Paragraph 3 of the Letter Contract (Contract File p. 4) provides in pertinent part as follows:

3. Contract Clauses Incorporated by Reference.—(a) The provisions of the

1. See opinion in General Dynamics/Astronautics Corp., ASBCA No. 7650, ¶ 3685, rendered March 12, 1963.

contract clauses set forth in the following paragraphs of the Armed Services Procurement Regulation in effect on the date hereof, and the additional clauses which are made a part of this Letter Contract in Exhibit "A," are hereby incorporated into this Letter Contract by reference, with the same force and effect as though herein set forth in full:

\*     \*     \*     \*     \*     \*

7–203.2   (Changes)

\*     \*     \*     \*     \*     \*

7–203.8   (Subcontracts)

\*     \*     \*     \*     \*     \*

7–103.12   (Disputes)

Exhibit A to the parties' Letter Contract (Contract File p. 7) provides in pertinent part as follows:

### CURRENT REIMBURSEMENTS

\* \* \* For the purpose of determining the amounts payable to the Contractor hereunder and subject to approval thereof by the Contracting Officer where required hereby, Allowable Costs will be determined by the Contracting Officer in accordance with the statement of cost principles set forth in Part 2 of Section XV of the Armed Services Procurement Regulations together with the Special Allowable Costs set forth below.

Section 7–203.8 of the Armed Services Procurement Regulations (ASPR), January 3, 1955, provides in pertinent part as follows:

### SUBCONTRACTS

(a) The Contractor shall give advance notification to the Contracting Officer of any proposed subcontract hereunder which (i) is on a cost or cost-plus-a-fixed-fee basis, or (ii) is on a fixed-price basis exceeding in dollar amount either $25,000 or five percent (5%·) of the total estimated cost of this contract.

(b) The Contractor shall not, without the prior written consent of the Contracting Officer, place any subcontract which (i) is on a cost or cost-plus-a-fixed-fee basis, or (ii) is on a fixed-price basis exceeding in dollar amount either $25,000 or five percent (5%) of the total estimated cost of this contract, or (iii) provides for the fabrication, purchase, rental, installation or other acquisition, of any item of industrial facilities, or of special tooling having a value in excess of $1,000, or (iv) is on a time-and-material or labor-hour basis. The Contracting Officer may, in his discretion, ratify in writing any such subcontract; such action shall constitute the consent of the Contracting Officer as required by this paragraph (b).

\*     \*     \*     \*     \*     \*

(d) The Contracting Officer may, in his discretion, specifically approve in writing any of the provisions of a subcontract. However, such approval or the consent of the Contracting Officer obtained as required by this clause shall not be construed to constitute a determination of the allowability of any cost under this contract, unless such approval specifically provides that it constitutes a determination of the allowability of such cost.

Part 2 of Section XV of ASPR, January 3, 1955, provides in pertinent part as follows:

15–201 General Basis for Determination of Costs. The total cost of a cost-reimbursement type contract is the sum of the allowable direct costs incident to the performance of the contract, plus the properly allocable portion of allowable indirect costs, less applicable income and other credits. The tests used in determining the allowability of costs also include (i) reasonableness, (ii) application of generally accepted accounting principles and practices, and (iii) any limitations as to types or amounts of cost items set forth in this Part 2 of Section XV or otherwise included in the contract. Failure to mention any item of cost in this part is not intended to imply that it is either allowable or not allowable. \* \* \* Income and other credits aris-

ing out of operations under the contract, where the related cost was reimbursed or accepted as an allowable cost, will be credited to the Government.

15–202 (Allowable Direct Costs)

\* \* \* \* \* \*

15–202.1 (Materials)

\* \* \* \* \* \*

15–202.2 (Labor)

\* \* \* \* \* \*

15–202.3 Other Direct Costs. There are numerous items of cost which are generally classified as indirect costs but which may, in particular cases, properly be chargeable directly to the Contract, where the Contractor demonstrates that such costs are specifically related to the Contract.

15–204 Examples of Items of Allowable Costs. Subject to the requirements of ASPR 16–201 with respect to the general basis for determining allowability of costs, and irrespective of whether the particular costs are treated by the Contractor as direct or indirect, the following items of costs are considered allowable within the limitations indicated:

\* \* \* \* \* \*

(g) Improvement of working conditions, employer-employee relations, and standards of performance;

\* \* \* \* \* \*

15–205 Examples of Items of Unallowable Costs. Irrespective of whether the particular costs are treated by the contractor as direct or indirect, the following items of cost are considered unallowable, except as indicated:

\* \* \* \* \* \*

(m) losses from sales or exchanges of capital assets, including investments;

(n) losses on other contracts;

\* \* \* \* \* \*

The plaintiff says that its housing project costs are allowable direct or indirect costs under paragraph 15–201 of Part 2, Section XV, ASPR, which is a part of the contract, supra, if they are reasonable and are not prohibited by generally accepted accounting principles and practices and are not specifically excluded from the contract, and, under paragraph 15–204, if they contribute to improvement of working conditions, employer-employee relations, and standards of performance. It contends that there was no failure on its part to apply generally accepted accounting principles and practices, and there is nothing in the contract that specifically excludes housing costs of the type involved here. It argues that the housing project did contribute to the improvement of working conditions, employer-employee relations, and standards of performance, and, therefore, the only question to be determined is the reasonableness of the plaintiff's actions under the circumstances.

The defendant raises a number of issues, but, in the main, they relate to the reasonableness of the actions of the plaintiff in entering into the housing project under the circumsances. Consequently, we conclude that the basic question to be decided is whether or not there was substantial evidence to support the Board's finding that the housing expenditures were unreasonable. If such finding is supported by substantial evidence, we are bound by the decision of the Board. The question of reasonableness is a question of fact. Acme Process Equipment Co. v. United States, 347 F.2d 538, 546–547, 171 Ct.Cl. 251, 264 (1965). We cannot substitute our judgment for that of the Board even if there is conflicting evidence and although there is evidence which would have supported a contrary finding by the Board. Confederated Tribes of the Warm Springs Reservation of Oregon v. United States, 177 Ct.Cl. 184, 195 (1966).

The Board not only found that the plaintiff acted unreasonably in going ahead with the housing construction after it knew, or should have known that adequate housing was being provided for its personnel by other means, but also that the housing expenditures were not incident to or necessary for plaintiff's business, the contract, or the perform-

ance of the contract. The Board further found that the incurring of these expenditures by the plaintiff in the face of the conclusion of the government to the contrary was unreasonable, and that it was indicated by prior events and confirmed by subsequent events that the housing was not necessary to the performance of the contract, and that it is doubtful whether the housing program made any contribution to the performance of the contract. The Board also found that when the plaintiff started the housing project notwithstanding the government's refusal to approve it and cover it under the contract, plaintiff did so as a private business venture, and its letter of October 23, 1956, so informed the government.

█ While the evidence on some of these findings was conflicting and may have been sufficient to support contrary findings by the Board, nevertheless, we concluded that there was substantial evidence in the record to support the findings of the Board and we are bound by such findings. The facts set forth above as well as those described below show the existence of such substantial evidence.

As early as September 1, 1955, the plaintiff was advised by its operations manager, Byron McNabb, at the Cape who had personally investigated the housing situation, as follows:

If the Base would make such an agreement [to purchase water from water companies] fresh water would become available throughout the entire area and FHA and VA housing would soon follow.

This fact was confirmed by a housing survey of the Air Force on February 10, 1956, which was furnished to the plaintiff. This report stated that FHA and VA would not furnish financing until a potable water supply was available. The report further stated:

They [the relators] all state that there would be ample housing constructed immediately if FHA guaranteed financing was available.

* * * [T]here are 8 or 10 developers anxious and capable of building 50 houses a day if FHA would approve personnel employed in the missile program as accepted mortgagors.

The water problem was solved by the Air Force when it entered into a water contract with the City of Cocoa on April 12, 1956, notice of which was given to plaintiff by the Air Force by telegram on June 6, 1956.

A week later, on June 13, 1956, the Sparkman Bill became law, authorizing FHA housing for workmen of the project. The government advised plaintiff of this fact by its telegram of July 23, 1956, and also notified the plaintiff that the Department of Defense had issued a certificate to FHA for mortgage guarantee on 1,000 houses under the Sparkman Bill. The telegram stated:

The Sparkman Bill became law on 13 June 1956—Pl 574. The Department of Defense has issued a certificate to FHA for mortgage guarantee on 1000 houses under the Sparkman Bill. Local FHA, Tampa office, believes that in view of interest already indicated by builders in Sparkman program, that considerable construction will be started immediately. App.Ex. 13; Bd. dec. p. 8.

The plaintiff received this telegram on July 24, 1956. At this point, the major obstacles to the building of houses in the area by private relators appear to have been removed. The plaintiff either knew or should have known that it would not be necessary for it to enter the housing business and that private housing would soon be available. The plaintiff ignored these facts and the assurances of the government, as well as the repeated warnings by the government that the costs of the housing project would not be allowed as costs of the contract. On August 9, 1956, after it received the above telegram, it signed a letter of intent with the Whitmor Corporation and signed a contract on September 14, 1956, for the building of the houses. We think that these facts, together with others in

the record, constitute substantial evidence for the findings of the Board adverse to the plaintiff.[2] The actions of the plaintiff were clearly unreasonable and indicated a determination on its part to enter into the transaction voluntarily as a private venture and to assume the risks of a profit or a loss with reference thereto.

Although our decision is not based on the actual course of events after August 9, 1956, the record shows that when the water and FHA financing became available, the private relators began the construction of many houses in the fall of 1956 and before the end of the year, and before the construction actually began on plaintiff's houses (February 1957), the tax records of Brevard County, where the Cape is located, showed that 2,656 houses had been constructed, as compared with 1,055 in 1955. Actually, so many houses became available that plaintiff had difficulty renting or selling its houses when they were finished. The last of plaintiff's houses was finished in August 1957.

The plaintiff could have absolved itself from all risks of loss on the housing project had it been able to obtain the advance written approval of the contracting officer of the housing contract as a subcontract in accordance with the provisions of Section 7–203.8, ASPR, supra, which was a part of the principal contract, but it did not ask for nor obtain such approval. In view of our other conclusions in the case, we do not reach the point raised by the defendant that plaintiff's failure to comply with Section 7–203.8, ASPR, bars its recovery in this case.

We hold that since the housing costs are not specifically included in the contract as allowable costs, and there is substantial evidence in the record to support the findings of the Board that such costs were not reasonable under Part 2 of Section XV of ASPR of January 3, 1955, the plaintiff is not entitled to recover.

## CONCLUSION OF LAW

Upon the foregoing opinion, which includes the necessary facts made as a part of the judgment herein, the court concludes as a matter of law that the decision of the Board is affirmed. Therefore, plaintiff is not entitled to recover and the petition is dismissed.

2. Plaintiff says that, in its opinion on reconsideration, the ASBCA relied on a housing survey report which was not made until long after the time when plaintiff entered into its contract with Whitmor. Even if plaintiff is correct in this assertion (and we are not sure that it is), the Board's opinion on reconsideration indicates on its face that this report was an "additional matter" which did not influence the original Board decision but was merely cited on reconsideration "in support" of that decision.