# United States Court of Appeals for the Federal Circuit

---

**KELLOGG BROWN & ROOT SERVICES, INC.,**
*Plaintiff-Appellant,*

v.

**UNITED STATES,**
*Defendant-Appellee.*

---

2013-5030

---

Appeal from the United States Court of Federal Claims in No. 09-CV-0428, Judge Christine O.C. Miller.

---

Decided: February 3, 2014

---

HERBERT L. FENSTER, McKenna Long & Aldridge LLP, of Denver, Colorado, argued for plaintiff-appellant. With him on the brief were JAMES J. GALLAGHER and PHILLIP R. SECKMAN.

J. REID PROUTY, Senior Trial Counsel, Commercial Litigation Branch, Civil Division, United States Department of Justice, of Washington, DC, argued for defendant-appellee. With him on the brief were STUART F. DELERY, Acting Assistant Attorney General, JEANNE E. DAVIDSON, Director, and BRYANT G. SNEE, Deputy Director.

---

Before MOORE, CLEVENGER, and REYNA, *Circuit Judges.*

REYNA, *Circuit Judge.*

Kellogg Brown & Root Services, Inc. ("KBR") appeals a decision by the United States Court of Federal Claims awarding KBR recovery of $6,779,762 out of $12,529,504 in costs incurred while providing services to the United States Army in Iraq. *Kellogg Brown & Root Servs., Inc. v. United States*, 107 Fed. Cl. 16 (2012). For the reasons below, we *affirm*.

## BACKGROUND

KBR and the Army entered into Contract No. DAAA09-02-D-0007 (the "LOGCAP III contract") on December 14, 2001, in connection with the United States' Logistics Civil Augmentation Program. Under the LOGCAP III contract, KBR agreed to provide logistics support services during Operation Iraqi Freedom as directed by the issuance of individual task orders ("TO"). The present dispute relates to costs incurred under two such task orders, TO 59 and TO 89, which required KBR to provide, install, operate and maintain dining facility services near Mosul, Iraq, at a site known as H4. TO 59 issued on August 12, 2003, and had a period of performance from June 13, 2003, to April 30, 2005. TO 89, which continued TO 59, commenced on April 29, 2005, with performance beginning on May 1, 2005. The LOGCAP III contract is primarily a cost-plus-award-fee[1] arrangement, and both TO 59 and TO 89 also provided that KBR would be compensated on a cost-plus-award-fee basis.

---

[1] Under a cost-plus-award-fee contract, which is a type of cost-reimbursement contract, a contractor is paid for all allowable costs incurred in contract performance plus an additional fee based upon the contractor's performance.

KBR selected ABC International Group ("ABC"), a subcontractor, to provide the services required under TO 59 and TO 89. Pursuant to the subcontract KBR awarded to ABC on March 8, 2004 (the "SK 465 subcontract"), ABC agreed to build a Kirby-style (prefabricated metal) dining facility at the H4 site and to provide dining services for a camp population of 2,573. The SK 465 subcontract had an initial period of performance of March 8, 2004, through June 12, 2004, with an optional period of performance from June 13, 2004, through June 12, 2005.

Although the cost for the initial period of performance was a fixed lump sum, ABC quoted monthly prices for the optional period according to three 1000-person numerical ranges or "headcount bands." Under each headcount band, ABC listed monthly costs for dining equipment, refrigeration units, generators, lease-to-purchase[2] of the dining facility, labor and consumables. The total monthly cost for the upper headcount band (3,501-4,500) was $977,935; the total monthly cost for the middle headcount band (2,501-3,500) was $869,735; and the total monthly cost for the lower headcount band (1,500-2,500) was $803,100. The middle headcount band was intended to encompass the target population (2,573), while the upper and lower bands were created as a pre-priced option that would be implemented, upon approval from the Army, to address fluctuations in the number of troops.

In June 2004, the Army ordered KBR to stop construction of the Kirby-style facility and begin construction of a dining facility made of reinforced concrete. The Army also increased the estimated headcount from 2,573 to 6,200+ persons. Instead of requesting bids for the new

---

[2] The total cost of building the dining facility was calculated based upon a 12-month lease-to-purchase arrangement pursuant to which ownership of the dining facility would pass to the Government after 12 months.

work, KBR decided to keep ABC as the subcontractor for the H4 site due to the urgency of the Army's request and to avoid incremental costs associated with switching subcontractors. Accordingly, KBR directed ABC to prepare a proposal for a reinforced concrete dining facility with capacity for 6,200+ troops.

ABC submitted its proposal on June 27, 2004, again providing prices in three headcount bands. As relevant here, the new total monthly cost for the middle headcount band (5,501-6,500) totaled $2,706,600, roughly triple the monthly cost initially quoted for the original middle headcount band (2,501-3,500). In a follow up to its proposal, ABC attributed the increased costs to the need to provide additional labor and equipment to serve a larger population and to the "drastic increase in the cost of labor and a severe shortage of available staff who are willing to work in Iraq."[3]

Jamal Nasery, Subcontract Administrator Team Leader, reviewed ABC's proposal and prepared a Price Negotiation Memorandum justifying the increased prices. The parties acknowledge that the Price Negotiation Memorandum was analytically flawed because Mr. Nasery calculated an erroneous benchmark against which to measure the reasonableness of ABC's proposal. Specifically, Mr. Nasery took the originally competed rates from the SK 465 subcontract and doubled both the monthly cost (from $869,735 to $1,739,470) and the cost per person (from $248.50 to $496.99). This error had the effect of quadrupling the estimated cost that served as the benchmark to compare against ABC's proposal. Mr. Nasery thus concluded that ABC's proposed pricing was reasonable when compared to the original SK 465 prices.

---

[3] The Army prohibited KBR from employing Iraqi nationals to work in dining facilities in Iraq.

KBR's management reviewed and approved Change Order 1, embodying ABC's proposal, pursuant to KBR's "greensheet-approval process." Specifically, Thomas R. Donley, DFAC Procurement, Material, and Property Manager for Iraq and Kuwait, and his supervisor Tom Quigley, reviewed Mr. Nasery's actions regarding Change Order 1, including the Price Negotiation Memorandum. They concluded that the increased expenditure was sufficiently justified and approved Change Order 1, which was executed on July 17, 2004. Mr. Donley later testified that Mr. Nasery's price justification "lacked lots of details that in hindsight should have been included and they weren't there." Change Order 1 was made effective June 13, 2004—the beginning of the option period—and KBR retroactively applied the new cost to billings starting on that date. On June 12, 2005, performance of the subcontract ended and title to the reinforced concrete dining facility passed to the Army.

In 2007, the Defense Contract Auditing Agency ("DCAA") suspended payment of certain costs paid by KBR to ABC pursuant to Change Order 1. KBR provided to DCAA the original price justification and also prepared a new price justification for the concrete dining facility. Based on the cost of building similar facilities in Jordan and Iraq, the new price justification estimated a total cost of $6,781,224 for the dining facility, thus concluding that the price paid pursuant to Change Order 1 ($6,792,000) was "fair and reasonable." Despite the price justifications submitted by KBR, DCAA still disapproved reimbursement of $12,529,504 KBR paid to ABC for equipment, the dining facility, labor and consumables.[4]

On July 20, 2009, KBR filed suit in the Court of Federal Claims seeking recovery of the $12,529,504 in costs

---

[4] DCAA did not question the amounts paid for refrigerators and generators.

disapproved for reimbursement. Following trial, the Court of Federal Claims held that KBR did not meet its burden to show that the costs it incurred were reasonable. The court found that KBR failed to demonstrate "that it employed sound business practices and acted as a reasonably prudent business person in accepting ABC's proposed prices for [Change Order 1]." 107 Fed. Cl. at 41. Nonetheless, relying on KBR's 2007 price justification and testimony by the Government's expert, the court determined that KBR was entitled to recover the portion of the disputed costs relating to construction of the concrete dining facility, which the parties stipulated totaled $6,779,762. *Id.* at 45.

KBR timely appealed to this Court. We have jurisdiction under 28 U.S.C. § 1295(a)(3).

DISCUSSION

Cost reasonableness is a question of fact. *Kellogg Brown & Root Servs., Inc. v. United States*, 728 F.3d 1348, 1360 (Fed. Cir. 2013) ("*KBR I*") (citing *Gen. Dynamics Corp. v. United States*, 410 F.2d 404, 409 (Ct. Cl. 1969)). We review factual findings of the Court of Federal Claims for clear error. *Vermont Yankee Nuclear Power Corp. v. Entergy Nuclear Vermont Yankee, LLC*, 683 F.3d 1330, 1338 (Fed. Cir. 2012).

The parties agree that the costs KBR seeks to recover are allowable if KBR meets its burden of showing that the costs are reasonable. According to the Federal Acquisition Regulation ("FAR"), a cost is reasonable "if, in its nature and amount, it does not exceed that which would be incurred by a prudent person in the conduct of competitive business." FAR § 31.201-3(a). As our previous decision dealing with the LOGCAP III contract explained, "[t]he standard for assessing reasonableness is flexible, allowing the Court of Federal Claims to consider many fact-intensive and context-specific factors." *KBR I*, 728

F.3d at 1360 (citing FAR § 31.201-3). These factors include:

> (1) Whether it is the type of cost generally recognized as ordinary and necessary for the conduct of the contractor's business or the contract performance;

> (2) Generally accepted sound business practices, arm's-length bargaining, and Federal and State laws and regulations;

> (3) The contractor's responsibilities to the Government, other customers, the owners of the business, employees, and the public at large; and

> (4) Any significant deviations from the contractor's established practices.

FAR § 31.201-3(b).

KBR agrees that it is bound by the reasonableness standard of FAR § 31.201-3, but argues that the standard incorporates a "broad range of reasonableness" with respect to cost-reimbursement contracts. Specifically, according to KBR, all costs associated with performance of a cost-reimbursement contract are reasonable unless they arise out of willful misconduct, gross negligence, or gross disregard of contractual obligations. KBR's argument, however, was directly rejected in *KBR I*, where this Court explained that "[a]lthough evidence of willful misconduct, gross negligence, or arbitrary conduct could well provide a basis for a contracting officer or court to disallow costs under the [FAR § 31.201-3], such evidence is not required." 728 F.3d at 1359.

KBR acknowledges this precedent, but argues that our decision in *KBR I* did not address whether or not the reasonableness standard for cost-reimbursement contracts encompasses costs incurred as a result of negligent mistakes. KBR points to several FAR clauses incorpo-

rated by reference into the LOGCAP III contract that require the Government to pay for various costs even when caused by the contractor's negligence. For example, FAR § 52.228-7 requires the Government to reimburse the contractor for certain liabilities to third persons not covered by insurance that arise out of the performance of the contract, "whether or not caused by the negligence of the Contractor," as long as the liabilities do not result from the contractor's willful misconduct or lack of good faith. *See* FAR § 52.228-7(c)(2), (e)(3).

We agree with KBR that, although the *KBR I* panel determined that the Court of Federal Claims "applied the correct standard articulated by FAR § 31.201-3," the decision did not elaborate further on the reasonableness standard for cost-reimbursement contracts except to reject the view that it encompasses every cost incurred unless resulting from gross misconduct, gross negligence or arbitrary conduct. In other words, our *KBR I* decision declined to adopt the line proposed by KBR but did not resolve where to draw the line or otherwise address how the cost-reimbursement nature of a contract may affect the reasonableness inquiry.

We need not, however, draw the line today. We recognize that cost-reimbursement contracts are intended to shift to the Government the risk of unexpected performance costs in situations when "[u]ncertainties involved in contract performance do not permit costs to be estimated with sufficient accuracy to use any type of fixed-price contract." *See* FAR § 16.301-2(a)(2). But we need not address to what extent, if any, cost reasonableness under cost-reimbursement contracts may include costs arising out of negligent mistakes, because KBR was grossly negligent as determined by the Court of Federal Claims. 107 Fed. Cl. at 41, n.19 ("KBR's management acted with gross disregard for the reasonableness of the proposed prices"). Hence, KBR does not satisfy the standard it advances. Not only was Mr. Nasery's Memorandum

seriously flawed, KBR's management was aware of the inadequacies of the Memorandum and still approved Change Order 1 without questioning the higher costs. The only explanation asserted by ABC at the time—the need for more equipment and a violence-induced increase in labor costs—is conclusory and devoid of any detail connecting the new headcount and building specifications to the quoted amounts. Although there might not have been any need to obtain further details regarding ABC's underlying cost data if the proposed costs had been within a reasonable range, the fact that Change Order 1 tripled the price for roughly double the troops should have prompted KBR to balk, or at least request an explanation of how ABC arrived at its proposal. Under these facts, we see no clear error in the determination by the Court of Federal Claims that KBR failed to show "that it employed sound business practices and acted as a reasonably prudent business person in accepting ABC's proposed prices for [Change Order 1]." 107 Fed. Cl. at 41.

KBR also argues that the Court of Federal Claims failed to consider the circumstances in which the decision to incur the Change Order 1 costs was made. According to KBR, its management acted reasonably in view of the urgency of the situation and the war zone environment in which KBR was operating. But the Court of Federal Claims did recognize that "the violence in Iraq [is] a circumstance bearing on the reasonableness of the agreed-upon prices." 107 Fed. Cl. at 40. The court also acknowledged that some price increase was warranted "due to the admitted fast-track order to provide greater capacity." *Id.* at 42. While the circumstances surrounding negotiations are certainly relevant, KBR still had the burden to show that a prudent businessperson would have accepted ABC's prices under those circumstances. The record here is simply devoid of a contemporary justification supporting a reasonableness finding with respect to the costs adopted in Change Order 1. We agree with the Court of

Federal Claims that, in view of the disproportionate increase in costs, a prudent business person would have attempted to engage in arm's-length negotiations with ABC and would not have accepted ABC's proposal "at face value." *Id*. Accordingly, the finding that KBR failed to act reasonably in approving the costs in Change Order 1 is not clearly erroneous.

KBR finally argues that what is ordinary and reasonable are concepts that simply do not apply to the battlefield because costs are likely to be extraordinary and arm's length bargaining is impracticable. KBR cites no support and we find no reason to ignore the FAR standards when a contract is being performed in a war zone. By definition, the reasonableness standard is flexible and affords the contractor discretion based on the circumstances surrounding performance. The reasonableness of a contractor's business judgment must be examined under the circumstances that existed at the time the cost was incurred, but such business judgment must still be exercised in a rational manner, even in wartime. In this case, the Court of Federal Claims properly considered the circumstances surrounding approval of Change Order 1, but determined that they were insufficient to justify the acceptance of unreasonable prices. We see no basis to disturb this determination.

## CONCLUSION

Because the Court of Federal Claims did not clearly err in its findings, we affirm its determination that KBR failed to meet its burden to show that the costs it seeks to recover are reasonable.

## AFFIRMED

## COSTS

Each party shall bear its own costs.