# ARMED SERVICES BOARD OF CONTRACT APPEALS

Appeal of -- )
)
BAE Systems San Francisco Ship Repair ) ASBCA No. 58810
)
Under Contract No. W912SU-04-D-0005 )

APPEARANCE FOR THE APPELLANT: Peter B. Jones, Esq.
Jones & Donovan
Newport Beach, CA

APPEARANCE FOR THE GOVERNMENT: Raymond M. Saunders, Esq.
Army Chief Trial Attorney
MAJ John R. Longley, JA
CPT Tyler L. Davidson, JA
Trial Attorneys

## OPINION BY ADMINISTRATIVE JUDGE TING
## ON APPELLANT'S MOTION FOR SUMMARY JUDGMENT

The Army (government) awarded BAE Systems San Francisco Ship Repair (BAE) a task order under a multiple-award, task order contract (MATOC) for the programmed maintenance of a Logistics Support Vessel. The parties' disputes center on the proper equitable adjustment of two items under the task order. This decision addresses BAE's motion for summary judgment on its potable and drain piping claim. BAE contends that, as a matter of law, it is entitled to $903,973.00 including the $351,244.12 the contracting officer (CO) allowed in her decision but remains unpaid. BAE contends that the claimed amount was verified by a Defense Contract Audit Agency (DCAA) report as having been incurred. The Army opposes the motion. For reasons set out below, we deny BAE's motion.

### Background

In 2004, the Mission and Installation Contracting Command at Fort Eustis, Virginia, received a requirement to issue contracts for the maintenance and repair of three classes of landing craft stationed at various ports in the Pacific Ocean (R4, tab 137 at 1). The vessels included the Army's Logistics Support Vessels also known as "LSV" - class vessels. The effort was referred to as the "Programmed Drydocking, Cleaning, Painting, Repairs and Modifications to US Army Active and Reserve Vessels Located on the West Coast of the United States and Hawaii." The work would be executed as a task order under a MATOC. (*Id.*)

BAE was one of five shipyards on the West Coast that competed for and received the right to bid on task orders issued for the Army's West Coast watercraft. On 2 April 2004, MATOC Contract No. W912SU-04-D-0005 (Contract 0005) was awarded to BAE in the estimated amount of $99,476,431.91. The contract was for a base year and four one-year options. (R4, tab 137 at 2)

Each task order under Contract 0005 would identify definite and indefinite work items to be performed. The contract defined "Definite Item" to mean "[k]nown work that shall be diligently prosecuted upon issuance of delivery order." The contract defined "Indefinite Item" to mean "[w]ork to be accomplished only upon the written approval of the Contracting Officer. Activation of an indefinite item does not entitle the Contractor to an extension of the performance period." (R4, tab 1 at 24, ¶¶ C.0.1.7., C.0.1.12.)

Contract 0005 also addresses situations where the government determines, during the repair of a vessel, that additional replacement parts, materials and installation are required:

> C.0.2.23.1. In addition to work specified in the specifications the Contractor shall furnish additional replacement parts, materials and installation which are determined to be required by the Government. The Contractor shall purchase additional replacements [sic] parts and materials required under this paragraph at the lowest known cost and shall be paid at cost. "At cost" is defined as the actual net cost of such parts and materials to the contractor including any and all discounts, rebates and allowances thereon (regardless of the date of purchase), material handling costs properly allocable to such parts or materials (if such costs are not reimbursable under any other provision of this contract), and properly identified and supported freight or transportation charges. The Contractor shall install and test such replacement parts and materials at no additional cost to the Government.

> C.0.2.23.2. If it is determined by the Government that additional replacements parts and materials require machining or fitting, the Contractor shall be paid under this paragraph at cost, as defined herein. The Contractor shall be compensated for installation of replacement parts or materials requiring machining and fitting. Costs for replacement parts, materials and installation shall be

2

allowed to the extent that they are reasonable, allocable and allowable in view of the principles of FAR Part 31.

(R4, tab 1 at 30)

In addition, Contract 0005 included in full text the following clauses: DFARS 252.217-7003, CHANGES (DEC 1991); DFARS 252.217-7004, JOB ORDERS AND COMPENSATION (DEC 1991); and DFARS 252.243-7002, REQUESTS FOR EQUITABLE ADJUSTMENT (MAR 1998) (R4, tab 1 at 340-41, 352). The contract incorporated by reference DFARS 252.243-7001, PRICING OF CONTRACT MODIFICATIONS (DEC 1991) clause providing:

> When costs are a factor in any price adjustment under this contract, the contract cost principles and procedures in FAR Part 31 and DFARS Part 231, in effect on the date of this contract, apply.

(R4, tab 1 at 329) The contract also included in full text DFARS 252.217-7028, OVER AND ABOVE WORK (DEC 1991) clause providing, in pertinent part:

> (a) *Definitions.*
>
> As used in this clause –
>
> (1) *Over and above work* means work discovered during the course of performing overhaul, maintenance, and repair efforts that is –
>
> (i) Within the general scope of the contract;
>
> (ii) Not covered by the line item(s) for the basic work under the contract; and
>
> (iii) Necessary in order to satisfactorily complete the contract.
>
> ....
>
> (e) The Contractor shall promptly submit to the Contracting Officer, a proposal for the over and above work. The Government and Contractor will then negotiate a settlement for the over and above work.

3

Contract modifications will be executed to definitize all over and above work.

> (f) Failure to agree on the price of over and above work shall be a dispute within the meaning of the Disputes clause of this contract.

(R4, tab 1 at 350-51)

Contract 0005 included a provision entitled "**OFFEROR'S FULLY BURDENED LABOR RATE FOR THE SECOND OPTION PERIOD**." This provision states:

> a. Changes are inherent to vessel repair contracts and should be expected by the Contractors. Offerors shall include a fully burdened labor rate to be used in negotiating changes. The rate must include all costs for negotiating changes, including but not limited to, G&A, overhead, profit, cost of money, etc. The offeror shall insert rates below that it agrees to use in negotiating changes for new or additional work. These rates shall prevail throughout satisfactory completion of the base period.

(R4, tab 1 at 393) For Option Period Two, from 1 December 2006 through 30 November 2007 (R4, tab 1 at 2), relevant here, this provision set the contractor's fully burdened rate at $73.50, G&A rate at 8.82%, and profit rate at 10% (R4, tab 1 at 393).

On 27 December 2006, Delivery Order (or task order) 0002 was awarded to BAE for an estimated amount of $4,889,413.73 for the programmed drydocking, cleaning, painting and repairs to the U.S. Army Vessel LSV-5. The LSV is an ocean-going vessel and is designed to carry supplies and equipment across the ocean or from other ships to shore. The LSV-5 is based at Bishop's Point, Hickam Air Force Base, Hawaii. Every three years, Class 1 vessels such as LSV-5, undergo drydocking and maintenance in order to keep all certifications current. Army vessels, unlike Navy warships, are built and maintained to commercial standards and use the American Bureau of Shipping as the certifying party. (R4, tab 137 at 2)

4

## STATEMENT OF FACTS (SOF) FOR PURPOSES OF THE MOTION

### *BAE's Motion for Summary Judgment*

Moving for summary judgment, BAE relies on the undisputed facts from the government's answer, documents in the Rule 4 file, and the declarations of Ron Bain (Bain), its Ship Manager for the LSV-5 repair and Rick Brandt (Brandt), its Finance Manager. We summarize below what BAE contends to be undisputed facts:

1. The LSV-5 specifications included "Definite Item" No. C.62.: "Potable Water and Air Conditioning Drain Piping Systems Replacements for LSV-5 (Definite)" (compl. and answer ¶ 5). This item references Moss Point Marine Drawing Nos. P-3 and P-13. Paragraph C.62.2. provides, in part:

> Scope of Work: Remove all existing potable water
> piping and drains throughout the entire vessel to include
> all air conditioning condensate drains. Replace entire
> piping system with copper nickel, 90/10 (CUNI) piping
> and all associated fitting as per referenced drawing.

(R4, tab 3 at 20) BAE subcontracted Item C.62. work to Custom Ship Interiors (CSI) for a firm-fixed-price (compl. and answer ¶ 7; R4, tab 105 at 30-31).

2. During performance of Item C.62., CSI discovered significant differences between the drawings referenced in that item and the potable water and drain piping systems that actually existed on the vessel. CSI reported those differences to BAE in 19 "Condition Found Reports" or "CFRs." Each of the CFRs provided a detailed list of materials required to replace the existing piping systems which were not shown on the Item C.62. referenced drawings. For each CFR, CSI provided an estimate to remove the old piping and a price to provide and install the new piping. For the 19 CFRs, CSI's price for labor and materials totaled $634,802 (decl. of Brandt ¶ 8; R4, tab 105 at 29).

3. In his declaration, Ship Manager Bain stated that he reviewed each of CSI's 19 CFRs and confirmed that the work proposed was additional work and not a part of the work covered by the contract. He declared that he determined CSI's estimates and prices to be reasonable before including them in BAE's proposal to the Army. (Decl. of Bain ¶ 5)

4. In submitting its CFRs to the Army, BAE requested that the Army issue change orders to cover the additional materials and labor to perform the CFR work. BAE's CFRs included not only CSI's prices but its own labor supporting and assisting CSI. (Compl. and answer ¶ 9; R4, tab 105 at 29)

5. The government acknowledged that "more piping material and labor would be required than had been indicated on the Government provided drawings or based upon what had been visible during the Appellant's November 28 and 29, 2006 [pre-bid] ship visit" (compl. and answer ¶ 10). During performance of the LSV-5 contract, Army Contracting Officer's Representative (COR) responded to numerous CFRs for additional piping requirements stating that the CFRs were "under review by the contracting officer" (compl. and answer ¶ 11). In order to complete the LSV-5 contract, BAE authorized CSI to provide the materials and perform the additional work described in its CFRs. BAE provided its labor in supporting and assisting CSI to complete the CFR work. (Decl. of Bain ¶ 8; compl. and answer ¶ 12).

6. After performance of the LSV-5 contract, BAE consolidated all of its CFRs and pricing proposals for the piping work into a single request for equitable adjustment – REA No. 7 – and submitted it to the CO (compl. and answer ¶ 13). The CO's 30 March 2010 letter acknowledged that "the specifications did not disclose the amount of materials needed," and "[o]nce the panels were removed, conditions found by BAE were not in accordance with the drawings." The letter went on to say "[t]he only issue left to be resolved is quantum." (Compl. and answer ¶ 14).

7. BAE maintains a job order accounting system to collect the actual labor hours and material costs of performing discrete contracts and discrete tasks within contracts, including changes (decl. of Brandt ¶ 3). On the LSV-5 contract, BAE created project numbers within its job order accounting system to collect labor hours and material and subcontractor costs on the potable water and drain piping systems. BAE's accounting system reports a total of 1,850.75 labor hours including 278.75 overtime labor hours, and $3,124 in material costs. (*Id.* ¶ 6).

8. BAE submitted a revised REA No. 7 in the amount of $903,973 to the CO by letter dated 3 June 2010 (R4, tabs 111, 113). Revised REA No. 7 included: (1) 1,851 hours of labor at the rate of $73.50 or $136,049; (2) 279 hours of overtime at the differential rate of $36.75 or $10,253; (3) material costs of $3,124; (4) CSI's subcontract costs of $634,802; and (5) markups for G&A at the rate of 8.82% or $56,265 and profit at the rate of 10% or $63,480 (R4, tab 113 at 3 of 28). BAE converted revised REA No. 7 to a certified claim by letter dated 6 July 2011 (R4, tab 120).

9. In October 2011, the CO asked the DCAA to audit BAE's claim (compl. and answer ¶ 23). According to BAE's Finance Manager's declaration, during DCAA's audit, BAE provided copies of BAE's records including invoices, detailed labor hour reports, labor time sheets and copies of CSI's material invoices and labor hour records (decl. of Brandt ¶ 7; R4, tab 129 at 6).

10. DCAA issued its report (Audit report No. 4281-2012W17200001) on 31 August 2012 (R4, tab 129). The report stated that DCAA evaluated the claimed costs following the applicable requirements in the Federal Acquisition Regulation (FAR) and the Defense Supplement (DFARS) (*id*. at 3 of 16). It opined that BAE "has submitted adequate data to support its claim," and "consider[ed] the claim to be acceptable as a basis for negotiation of fair and reasonable settlements" (*id*. at 4 of 16).

11. On a more detailed level, DCAA found BAE established two charge numbers "for REA No. 7 to take costs" and BAE "prepared its proposed REAs costs using the recorded costs from these...charge numbers" (R4, tab 129 at 6 of 16). In terms of labor costs, DCAA took "no exception to the proposed labor cost, labor hours and labor rate for...[REA]...No. 7" stating that it "reconciled the proposed labor hours from the claim to the labor distribution report for each REA" and "[e]mployee labor charges were selectively traced to the labor distribution report for each REA" (*id*. at 6-7 of 16). In terms of materials, DCAA took "no exception to the proposed...REA No. 7 material costs proposed" (*id*. at 7 of 16). In terms of subcontractor costs, DCAA questioned 20 hours of proposed overtime hours or $520 resulting from a difference between the labor hours proposed and recorded (*id*. at 8 of 16). DCAA took no exception to the balance of the proposed costs of $634,282[1] (*id*. at 7 of 16). DCAA questioned $46 of the proposed G&A costs and found the profit rate of 10% was "applied to subcontracts only" for REA No. 7 (*id*. at 10 of 16). Of the $903,973 claimed, DCAA questioned $566 ($520 + $46) and took no exception to $903,407 (*id*. at 5 of 16).

12. According to BAE, the CO dismissed the DCAA report entirely. And, in a decision issued on 1 August 2013, she determined that BAE was entitled to recover $351,244.12 for the piping claim. As of 2 April 2014 when BAE filed its motion for summary judgment, no payment of the allowed amount has been made. (Mot. at 7-8, ¶¶ 28, 29)

*The Government's Opposition*

13. The CO's 1 August 2013 decision is actually more comprehensive than the way BAE presented it. The decision amended the CO's previous decision of 25 July 2013 and partially denied BAE's $903,973.00 claim by allowing $351,244.12. (R4, tab 138 at 1) With respect to the DCAA audit report, the CO decision explained:

---

[1] The audit report mistakenly used $364,282 instead of $634,282 (R4, tab 129 at 7 of 16).

> Defense Contract Audit Agency (DCAA)...did not
> question the amounts of your proposed claim. All DCAA
> did, unfortunately, was verify the addition of the claim
> without verifying any of the underlying facts. DCAA did
> not have any of the original time cards or any other
> information beyond the summary you provided. DCAA
> took no exception to the proposed material costs. DCAA
> specifically did not examine entitlement, but only looked
> at quantum. DCAA had no knowledge of the actual facts
> and did not look beyond the information offered by BAE.

(R4, tab 138 at 11)

14. In her 13-page decision, the CO discussed each of the 19 CFRs individually (R4, tab 138 at 3-10). Because BAE's 8 July 2009 REA was reduced by its 3 June 2010 REA, and because BAE's total hours did not break down to the 19 CFRs individually, the CO reduced the labor hours proportionally by 33% and the material costs by 43% "across the individual CFRs for analysis" (*id.* at 11).

15. In going through BAE's CFRs, the CO found numerous instances of overcharging and lack of support for the amounts claimed. For example, in the case of CFR 173, the CO found:

> CSI proposed that it would require thirty-eight ½" valves
> (the invoices did not substantiate that any were
> purchased), twelve 1" ball gate valves (quoted at $214 but
> purchased for $129 each) for material costs of $8,078.00,
> of which only $1,548.00 was substantiated. CSI went on
> to add 100 hours of labor, $80 in freight (none was
> charged).

(R4, tab 138 at 4) In the case of CFR 211, CSI claimed 1 ¼" piping at "$19.20 ($2,112.00) rather than the $15.70 ($1,727.00) paid," and "[t]wo inch couplings were charged at $32.00 a piece when CSI only paid $25.27 ($288 vs. $227)" (*id.* at 6). In the case of CFR 223, CSI estimated 306 feet of 1.5", 2" and 3" piping, but claimed to have installed 1,664 feet of piping. CSI and BAE claimed $33.35 a foot for the 2" piping but the invoices show it was purchased for $28.98. CSI claimed to have installed 1,420 feet of 2" piping but it only purchased 620 feet. It claimed it installed 220 feet of 3" piping when the invoice showed only 140 feet of 3" piping was purchased. (*Id.* at 7) Other than these examples, the CO found instances where parts were charged in excess of the amounts invoiced or paid (CFRs 166, 203, 204, 209, 212, 213, 238) and where freight charges were not supported (*id.* at 12-13).

16. While DCAA took no exception to most, if not all, of the costs BAE booked for REA No. 7, the audit report made clear that it "assumes [BAE] can demonstrate legal entitlement" (R4, tab 129 at 3 of 16). Thus, DCAA has not evaluated whether BAE, and by extension CSI, purchased replacement parts and materials in accordance with paragraph C.0.2.23.1. (parts and materials at cost and properly supported freight charges) of the contract.

17. Citing to the two job labor status reports and the full breakout BAE furnished, the government disputes in its opposition to BAE's motion for summary judgment the labor hours BAE claimed on the basis that BAE failed to differentiate between the work it was obligated to perform under the original contract and the additional work discovered during contract performance (gov't reply at 13-16). Citing to the form letters provided with a number of CSI's CFRs, the government's opposition to BAE's motion also asserts that BAE's claimed prime contractor labor costs were for services CSI as subcontractor actually performed in completing the additional piping replacement work (id. at 16).

18. BAE claims $634,802 in subcontractor (CSI) costs for additional pipe replacement work. Citing to the record, the government's opposition asserts that the subcontractor costs BAE actually incurred for the additional piping work was $350,000 (gov't reply at 5). In response, BAE contends that the $634,802 was CSI's estimate to perform the additional piping work in the CFRs, and the $350,000 represented partial payment BAE made to CSI to provide financing to a small business subcontractor to do the work (app. resp. at 5). The government asserts that the subcontractor, CSI, failed to differentiate between the work it was paid to perform under the original contract and the additional piping work discovered during contract performance (gov't reply at 5-6). Citing to the record, the government also asserts that the subcontractor's claimed labor and material costs do not reflect its actual labor and material costs because CSI's CFRs do not reflect the actual price and quantity of piping material ultimately furnished and BAE was claiming unsubstantiated per diem charges (id. at 11).

DECISION

The LSV-5 contract required BAE to remove all existing potable water piping and drains and to replace the entire piping system in accordance with certain referenced drawings. BAE subcontracted the piping work to CSI. CSI discovered differences between the piping system actually existing on the vessel and that shown in the referenced drawings. It reported the differences to BAE in 19 CFRs detailing the costs to remove the old piping system and to install a new piping system. In order to finish the contract, BAE authorized CSI to perform the work described in the CFRs.

9

After completion of the contract, BAE consolidated the CFRs into REA No. 7 and submitted it to the CO for payment. REA No. 7, as revised, sought $930,973. In July 2011, BAE converted REA No. 7 into a certified claim. In October 2011, the CO asked DCAA to audit the claim. Of the $903,973 claimed, DCAA's audit report questioned $520 in subcontractor overtime charges and $46 in G&A; it took no exception to the remaining $903,407 claimed. The CO's decision determined BAE was entitled to recover $351,244.12.

Moving for summary judgment, BAE contends that "[t]his case presents a single issue: should the contractor's equitable adjustment amount be based on the contractor's actual, recorded costs of performing the additional work, including the subcontractor's contemporaneous prices, as confirmed by Government auditors, or should the amount be based on an estimate by Government personnel?" (app. mem. in support of mot. at 7). BAE tells us that its "proposed costs are actual costs recorded in charge numbers established 'to take costs' of REA No. 7," and DCAA has confirmed that "the prices submitted by the subcontractor, CSI, were reconciled to CSI's material invoices and labor hour records" (*id.* at 8). BAE argues that "those costs 'should be used to determine the equitable adjustment[s]'" (*id.*), and "[t]he Government should not be heard to impeach or contradict its own auditors" (*id.* at 11).

Summary judgment is appropriate when the cited materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations, admissions, interrogatory answers, or other material show that there is no genuine dispute as to any material fact and that the moving party is entitled to a judgment as a matter of law. FED. R. CIV. P. 56(a), (c)(1); *Mingus Constructors, Inc. v. United States*, 812 F.2d 1387, 1390 (Fed. Cir. 1987). The moving party has the burden of showing the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party makes the requisite showing, then the burden shifts to the nonmoving party to show there is a genuine factual issue for trial. *Id.* In deciding motions for summary judgment, we do not resolve factual disputes, but determine if genuine disputes of material facts exist. *Applied Companies*, ASBCA Nos. 50593, 52102, 99-2 BCA ¶ 30,554 at 150,883.

The substantive law identifies which facts are material. Only disputes over material facts under the governing law will properly preclude the entry of summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Osborne Constr. Co.*, ASBCA No. 55030, 09-1 BCA ¶ 34,083 at 168,512 ("Substantive law dictates the parties' relative burdens, and defines those 'material' facts that may affect the outcome of a particular cause of action.").

10

We do not agree that BAE's REA No. 7 costs are automatically allowable simply because BAE's actual costs were recorded in the charge numbers established "to take costs," and because DCAA reconciled CSI's costs to its material invoices and labor records.

First, when a contractor submits a claim, the Contract Disputes Act assigns the CO not the DCAA auditors authority to decide the claim. 41 U.S.C. § 7103(d), (e) and (f). As a matter of law, it is the CO's prerogative to accept all or part of a contractor's claim or reject the claim entirely. There should be no confusion on this point. The DCAA's report made clear that in auditing quantum it "assumes [BAE] can demonstrate legal entitlement" (SOF ¶ 16). Moreover, BAE's argument on this point, if accepted, would mean that a CO would be unable to decide in favor of a contractor if DCAA cannot confirm a cost as having been incurred even though the facts demonstrate that work was undisputedly accomplished. Once a CO decision is appealed to this Board, the parties start with a clean slate and the contractor bears the burden of proving liability and damages *de novo*. *Wilner v. United States*, 24 F.3d 1397, 1401-02 (Fed. Cir. 1994) (en banc).

Second, under the LSV-5 contract's Pricing of Contract Modifications clause, when costs are a factor in any price adjustment, the cost principles in FAR Part 31 apply. FAR 31.201-2 provides that among the factors to be considered in determining whether a cost is allowable include "(1) Reasonableness. (2) Allocability.…[and] (4) Terms of the contract." In defining reasonableness, FAR 31.201-3(a) provides that:

> No presumption of reasonableness shall be attached to the incurrence of costs by a contractor. If an initial review of the facts results in a challenge of a specific cost by the contracting officer or the contracting officer's representative, the burden of proof shall be upon the contractor to establish that such cost is reasonable.

BAE argues that the CO's challenge of costs "should precede an audit, so the auditor can help to resolve it." It argues "Now that DCAA has audited, including an evaluation of reasonableness, it is far too late for Government trial attorneys to spring a FAR § 31.201-3 challenge." (App. resp. at 11) We do not interpret FAR 31.201-3 to require the CO to challenge a contractor's claimed costs before initiating an audit. In this case, the CO's 13-page decision issued on 1 August 2013 (SOF ¶ 13) challenged all but $351,244.12 of BAE's $903,973.00 claim. Based on this challenge, FAR 31.201-3 assigned to the contractor the burden of proof that the costs claimed are reasonable.

11

Interpreting FAR 31.201-3(a), the Federal Circuit has confirmed that the contractor has the burden of proof, unaided by a presumption of reasonableness, to establish that the costs it incurred were reasonable. *Kellogg Brown & Root Services, Inc. v. United States*, 728 F.3d 1348, 1363 (Fed. Cir. 2013) ("It seems that KBR seeks a presumption that it is entitled to reimbursement simply because it incurred facilities costs. It is not."). The Court has also said "Cost reasonableness is a question of fact." *Kellogg Brown & Root Services, Inc. v. United States*, 742 F.3d 967, 970 (Fed. Cir. 2014) (finding the fact a change order tripled the price of providing dining services for roughly double the troops should have prompted the prime contractor to balk or at least request an explanation of how the subcontractor arrived at its proposal) and issues relating to reasonableness are "intensely factual," and summary judgment is inappropriate when "the evidence is such that a reasonable jury could reach a verdict in [the non-movant's] favor." *Scott Timber Co. v. United States*, 333 F.3d 1358, 1369 (Fed. Cir. 2003); *see also DynCorp*, ASBCA No. 53098, 01-2 BCA ¶ 31,476 at 155,405 (summary judgment denied where "[w]e have been given no opinion by anyone...and no comparative data as to the reasonableness of the specific costs").

Faced with the CO's challenge in her decision, BAE's motion for summary judgment – based solely on the grounds that (1) the $903,407 of the $903,973.00 claimed was "confirmed by DCAA" (app. mem. in support of mot. at 11) and (2) its ship manager's conclusory declaration that the additional piping work was not a part of the contract and CSI's prices were reasonable (SOF ¶ 3) – does not meet the requirement, imposed by law, that the contractor meet its initial burden of establishing that the costs it claimed are reasonable.

In this case, the CO found numerous instances where the amounts claimed for replacement parts and materials exceeded the amounts invoiced or paid. She also found instances where the freight charges claimed were not supported. (SOF ¶ 15) Moreover, the government's opposition to BAE's motion for summary judgment asserts that BAE's claimed labor costs failed to differentiate between (1) what it was obligated to perform under the contract and what was additional piping work discovered during contract performance and (2) what labor costs were incurred by itself and what labor costs were incurred by CSI (SOF ¶ 17). The government's opposition also asserts that CSI's claim failed to differentiate between what it was obligated to perform under its contract with BAE and what it performed as additional work (SOF ¶ 18). These issues are material to whether BAE's claims are allowable under FAR 31.201-2 and FAR 31.201-3 and payable under the contract terms (¶ C.0.2.23.1.). As the case now stands, we are required to draw all justifiable inferences in favor of the government as the nonmoving party. *Liberty Lobby*, 477 U.S. at 255.

## CONCLUSION

Because BAE, as the moving party, has failed to meet its burden of showing the absence of a genuine dispute of material fact relating to the reasonableness of the costs claimed and the support required, its motion for summary judgment is denied.

Dated: 15 July 2014

PETER D. TING
Administrative Judge
Armed Services Board
of Contract Appeals

I concur

I concur

MARK N. STEMPLER
Administrative Judge
Acting Chairman
Armed Services Board
of Contract Appeals

MARK A. MELNICK
Administrative Judge
Acting Vice Chairman
Armed Services Board
of Contract Appeals

I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals in ASBCA No. 58810, Appeal of BAE Systems San Francisco Ship Repair, rendered in conformance with the Board's Charter.

Dated:

JEFFREY D. GARDIN
Recorder, Armed Services
Board of Contract Appeals

13