ARMED SERVICES BOARD OF CONTRACT APPEALS

| | |
|---|---|
| Appeal of -- | ) |
| | ) |
| Kellogg Brown & Root Services, Inc. | ) ASBCA No. 58175 |
| | ) |
| Under Contract No. DAAA09-02-D-0007 | ) |

APPEARANCES FOR THE APPELLANT: Jason N. Workmaster, Esq.
Raymond B. Biagini, Esq.
Alejandro L. Sarria, Esq.
Patrick J. Stanton, Esq.
 Covington & Burling LLP
 Washington, DC

APPEARANCES FOR THE GOVERNMENT: E. Michael Chiaparas, Esq.
 DCMA Chief Trial Attorney
Carol Matsunaga, Esq.
 Senior Trial Attorney
 Defense Contract Management Agency
 Carson, CA

OPINION BY ADMINISTRATIVE JUDGE SCOTT

Kellogg Brown & Root Services, Inc. (KBR) appealed under the Contract Disputes Act (CDA), 41 U.S.C. §§ 7101-7109, from the contracting officer's (CO's) final decision denying its claim for subcontractor costs and asserting an $11,483,487 claim against it for subcontractor costs the government paid to KBR under a task order (TO) issued under the subject indefinite-delivery, indefinite-quantity (IDIQ) contract with the U.S. Army for logistical support. Previously, the Board denied KBR's motion for summary judgment that the government's claim was time-barred by the CDA's six-year statute of limitations and we granted the government's cross-motion for summary judgment that its claim was not time-barred, after a hearing on the motions. *Kellogg Brown & Root Services, Inc.*, ASBCA No. 58175, 15-1 BCA ¶ 35,988 (*KBR IV*). We denied KBR's motion for reconsideration as untimely. *Kellogg Brown & Root Services, Inc.*, ASBCA No. 58175, 15-1 BCA ¶ 36,075. Thereafter, the Board conducted a hearing on entitlement and quantum. For the reasons that follow, we deny the appeal.

## FINDINGS OF FACT

### The Contract, Task Order No. 59, and Regulations

1. Effective 14 December 2001, the U.S. Army awarded the subject IDIQ contract to Brown & Root Services pursuant to the Army's Logistics Civil Augmentation Program (LOGCAP). The contract (hereafter sometimes the "LOGCAP III" contract) was a negotiated services type. It required KBR, among other things, to provide combat services support, including dining facility (DFAC) services, for overseas contingency operations.[1] TOs could be issued on a firm-fixed-price or cost-reimbursement basis. On 1 August 2003 the contract was novated to KBR, a subsidiary of Kellogg Brown & Root, Inc.[2] (R4, tab 1 at 1; compl. and answer ¶ 10[3])

2. The contract incorporated by reference the Federal Acquisition Regulation (FAR) 52.216-7, ALLOWABLE COST AND PAYMENT (MAR 2000) clause (R4, tab 1 at 36), which provides in part:

> (a) *Invoicing.* The Government shall make payments to the Contractor when requested as work progresses...in amounts determined to be allowable by the [CO] in accordance with Subpart 31.2 of the [FAR] in effect on the date of this contract[4] and the terms of this contract....

> (b) *Reimbursing costs.* (1) For the purpose of reimbursing allowable costs...the term "costs" includes only—

> ....

> (ii) When the Contractor is not delinquent in paying costs of contract performance in the ordinary course of business, costs incurred, but not necessarily paid, for—

> (A) Supplies and services purchased directly for the contract and associated financing payments to subcontractors, provided payments will be made—

---

[1] A "contingency operation" refers to a military operation as defined in FAR 2.101.

[2] The record includes other iterations of the contractor's name. For ease we use "KBR."

[3] Support for this and other fact findings, regarding facts the parties have not disputed, is also found in the parties' motion papers, cited in the Board's Statement of Facts in *KBR IV*. Citations to the motion papers are not repeated here.

[4] In this decision we apply the regulations in effect upon the date of contract award.

(1) In accordance with the terms and conditions of a subcontract or invoice....

3. The referenced FAR Subpart 31.2 provides in part:

**31.201-2 Determining allowability.**

(a) The factors to be considered in determining whether a cost is allowable include the following:

(1) Reasonableness.

(2) Allocability.

(3) Standards promulgated by the CAS [Cost Accounting Standards] Board, if applicable; otherwise, generally accepted accounting principles and practices appropriate to the particular circumstances.

(4) Terms of the contract.

(5) Any limitations set forth in this subpart.

....

(d) A contractor is responsible for accounting for costs appropriately and for maintaining records, including supporting documentation, adequate to demonstrate that costs claimed have been incurred, are allocable to the contract, and comply with applicable cost principles in this subpart and agency supplements. The [CO] may disallow all or part of a claimed cost which is inadequately supported.

**31.201-3 Determining reasonableness.**

(a) A cost is reasonable if, in its nature and amount, it does not exceed that which would be incurred by a prudent person in the conduct of competitive business.... No presumption of reasonableness shall be attached to the incurrence of costs by a contractor. If an initial review of the facts results in a challenge of a specific cost by the [CO] or

3

the [CO's] representative, the burden of proof shall be upon the contractor to establish that such cost is reasonable.

(b) What is reasonable depends upon a variety of considerations and circumstances, including—

(1) Whether it is the type of cost generally recognized as ordinary and necessary for the conduct of the contractor's business or the contract performance;

(2) Generally accepted sound business practices, arm's-length bargaining, and Federal and State laws and regulations;

(3) The contractor's responsibilities to the Government, other customers, the owners of the business, employees, and the public at large; and

(4) Any significant deviations from the contractor's established practices.

4. The contract also incorporated by reference the FAR 52.232-17, INTEREST (JUN 1996) clause (R4, tab 1 at 37), which provides in part:

(a)...[A]ll amounts that become payable by the Contractor to the Government under this contract...shall bear simple interest from the date due until paid unless paid within 30 days of becoming due. The interest rate shall be the interest rate established by the Secretary of the Treasury as provided in Section 12 of the [CDA], which is applicable to the period in which the amount becomes due..., and then at the rate applicable for each six-month period as fixed by the Secretary until the amount is paid.

(b) Amounts shall be due at the earliest of the following dates:

(1) The date fixed under this contract.

(2) The date of the first written demand for payment consistent with this contract....

5. The LOGCAP III contract's Statement of Work (SOW), attachment 001 to the contract, provided under paragraph 7.0, Government Directives and Applicable Documents:

> **7.1 General.** The Contractor is obligated to follow and adhere to the Governing directives and applicable documents as listed in the contract and the SOW. Supplements or amendments to those documents shall be considered to be in full force and effect upon receipt by the Contractor, except when such document is deemed to cause an increase or decrease in the cost of contract performance. In such event, the Contractor shall inform the [CO] in writing prior to implementation of such supplement or change. If applicable, a negotiated change in contract price shall be made to the mutual satisfaction of both the Contractor and Government prior to implementation of the change.

(Bd. ex. 1 at 28)

6. Attachment 002 to the contract, section H, Special Contract Requirements—continued, provides in part at section H-13 Management:

> The [CO] is the only authorized official who shall increase, decrease, or alter the scope of work to be performed, and any orders or instructions interpreted by the contractor as impacting the scope or cost of the contract.
>
> The contractor shall comply, and shall ensure that all deployed employees, subcontractors, subcontractors['] employees, invitees and agents comply with pertinent Service and Department of Defense directives, policies and procedures....

(Bd. ex. 2 at 1)

7. Effective 13 June 2003 the Army issued cost-plus-award-fee TO No. 59 to KBR, for logistics and life support services necessary to support Operation Iraqi Freedom (OIF). The performance period, as extended, expired on 30 April 2005. (R4, tab 2) The procuring contracting officer (PCO) from the Army's Support Command in Rock Island, Illinois (ASC), delegated administrative contracting officer (ACO) authority to the Defense Contract Management Agency's (DCMA's) Command-San Antonio, which sub-delegated the authority to DCMA Middle East. Under the sub-delegation, the ACO was to be co-located with the contractor and to be its single point of contact for all contract administration requirements under the SOW and other mission-related tasks. The delegated authority

5

excluded taking any action that involved changing the TO's value or the contract's performance period. (Supp. R4, tab 200 at 1, tab 201 at 1)

Site H-3, Subcontracting, Letters of Technical Direction, Modification No. 14

8. SOW, Change 5, incorporated into TO No. 59 by Modification (Mod.) No. 06, effective 3 October 2003, required KBR to provide DFAC services at over 25 Iraqi sites, including Qaiyara Mosul West, site H-3. The SOW, paragraph 1.0, provided that services for each site were specified "in accordance with the site population." (R4, tab 3 at 63) For site H-3 the SOW specified a minimum of 5,200 personnel. Under SOW paragraph 1.4, unless otherwise specified, all SOW increases, decreases or modifications were to be directed by the ACO. (R4, tab 3 at 55, 63, 95, *see* tab 4 at 106) Under paragraph H.8.1 of SOW Change 5, KBR was to:

> [P]rovide, emplace, operate and maintain food service facilities, provide food service management operations to accommodate the base camp population, serving 4 meals per day IAW applicable Army regulations and the command's meal cycle for the area.

(R4, tab 3 at 97) SOW Change 6 V10.2 to TO No. 59, dated 3 November 2003, reflected headcounts for DFAC purposes at site H-3 at two levels, 4,300 and 2,200, for a total of 6,500 (app. supp. R4, tab 31 at 1522).

9. KBR first subcontracted for DFAC services at site H-3 with The Event Source. In early 2004, KBR solicited bids for a replacement subcontract. (App. supp. R4, tab 29, subtabs B, C, *see* tab 100 at 2477, notes 1, 11) KBR and Gulf Catering Co. (GCC) executed Subcontract No. SK00425 (SK425) on 8 February 2004. It was dated 5 February 2004 and effective on 14 February 2004. (R4, tab 4 at 101, 105, tab 17 at 421) Under the subcontract GCC was to prepare and serve an estimated 5,400 meals per meal period (four per day) at site H-3. The performance period ended on 13 February 2005. The subcontract had fixed monthly prices for the DFAC facility, daily labor rates, and monthly prices for equipment at total estimated not-to-exceed (NTE) prices based upon the 5,400 headcount. (R4, tab 4 at 105-06) If quantities were to "increase or decrease for a sustained period," the charges could be adjusted within 10 days' notice by either party (*id.* at 103). The subcontract stated:

> **NOTE:** [GCC] will invoice and be paid for **Actual Headcount** only. The Projected Headcount section on the "Projected Daily Headcount Sheet and Actual Headcount" attachment is for planning and preparation purposes only.

The incorporated form entitled "Projected Daily Headcount Sheet and Actual Headcount" **MUST** be completed on a daily basis....

Under a Subsistence Prime Vendor (SPV) program, GCC was to eliminate food costs on 5 April 2004. (*Id.*)

10. BG Carter Ham, USA, who was the Commander, Headquarters, Task Force Olympia, Mosul, Iraq, sent a memorandum dated 9 February 2004 to the Commander of the Combined Joint Task Force 7, BG Scott West, USA, who was the director of logistics for the combined task force, with theater-level responsibility for all logistics operations in Iraq. BG West was responsible for oversight of the LOGCAP planning cell. (R4, tab 5 at 118; tr. 1/18, *see* tr. 1/33) BG Ham sought approval to increase headcount-based LOGCAP services at base camp H-1 and to decrease them at other sites, including H-3, due to population shifts from OIF 1 to OIF 2 (R4, tab 5 at 118-19). The memorandum included headcounts that reflected the shifts. Except for H-1, the headcounts at each of the H sites, including H-3, were reduced. For H-3, the headcount was reduced from 6,500 to 1,422, a reduction of 5,078—the largest reduction of all of the H sites.[5] The memorandum stated that the headcount generated by OIF 2 was "still not 100%" (*id.* at 118), and there could be adjustments at H-1 and H-2. There was no mention of any anticipated adjustment at H-3. The memorandum stated that the cost impact would be minimal as the request was to readjust resources, not to create additional requirements.

11. Effective 4 January 2004, stated to be in conformance with FAR Subpart 1.6, DCMA Iraq appointed Lt Col Russell J. Blaine, USAF,[6] as a CO, to assume the duties of an ACO under FAR 42.302 (with an irrelevant exception) and a DCMA Directive (supp. R4, tab 202). FAR 1.602-1(a), upon which KBR relies, provides that COs may bind the government only to the extent of their delegated authority. FAR 42.302 lists numerous contract administration functions of an ACO.[7] As one example, FAR 42.302(a)(67) includes supporting the program, product and project offices regarding program reviews, program status and program performance. Lt Col Blaine arrived in Iraq on 4 January 2004. He served as the ACO and Commander, DCMA Northern Iraq and reported to BG West. (Tr. 1/17-18)

12. KBR has placed the meaning of contract "value" at issue (*see* finding 7). In Lt Col Blaine's experience, the "value" of a contract varies depending upon contract type. Firm-fixed-price contracts have a stated dollar value; cost-reimbursement contracts have an

---

[5] KBR contended in its claim that, at this time, the number was 5,400, not 6,500 (R4, tab 17 at 421), but 6,500 was a combined figure (*see* finding 8).

[6] Lt Col Blaine retired from the Air Force in June 2009 and worked in the private sector as of the hearing (tr. 1/8, 15).

[7] FAR 42.302 refers to a "CAO" (contract administration office). *See* FAR 42.301.

estimated contract value—i.e., the estimated cost to perform the work; and negotiated contracts can be in a negotiated amount plus an award fee. TO No. 59 had a negotiated value of approximately $3 billion, plus 2 "incremental leaps," while Lt Col Blaine was the ACO. (Tr. 1/27) We accept Lt Col Blaine's assessment of the "value" of TO No. 59 while he was the ACO.

13. By email of 17 February 2004, Lt Col Blaine sent "LETTER OF TECHNICAL DIRECTION 04-59-CJTF7-03, (H Site Planning Figures)" dated 15 February 2004, signed by him on 17 February (hereafter "February LOTD"), to James Ray, KBR's Director of Contracting, located at its Regional Support Office in Baghdad, Iraq. The email was copied to others, including U.S. Army MAJ Ramona McCaa. Under a six-month assignment beginning in November 2003 MAJ McCaa served as the field ACO for the H sites. She was stationed at the Mosul Airfield in Iraq (after about a month's introductory period in Kuwait). (R4, tab 5 at 114; tr. 1/25, 28, 62, 75, 79)

14. The February LOTD referred to the LOGCAP III contract, TO No. 59 and BG Ham's 9 February 2004 memorandum, which it appended. The LOTD stated that, in accordance with that memorandum, "KBR is requested to use the following planning figures for sites H1 through H5 **until further notice**" (R4, tab 5 at 114) (emphasis added). The figures were the same as those in BG Ham's memorandum, including 1,422 for site H-3. The LOTD stated that:

> The effect of this request is to change H1 from a site receiving SOW para 8.20 services to a site entitled to SOW 8.0 services. Please begin providing para 8.0 level services to Site H1, and appropriately adjust the levels of population-based service dedicated to sites H2-H5.[8]

(R4, tab 5 at 114) The February LOTD stated that the government believed it was within the contract's scope; the cost impact should be minimal as services were "reallocated from shrinking sites" (id.); and KBR was to submit, within five days, the increase or decrease in its original estimated cost, a schedule leading to the successful conclusion of the effort, proposed performance criteria, and suggested changes to the SOW necessitated by the effort. The LOTD stated that KBR was to contact Lt Col Blaine for contractual questions. There is no evidence that KBR ever contacted Lt Col Blaine with questions; or suggested that the February LOTD was not within TO No. 59's scope or changed its value; or that KBR submitted any increase or decrease in its estimated costs or proposed changes to the

---

[8] The SOW Change 5 did not have a paragraph 8.0 or 8.20. According to Lt Col Blaine, the information was likely pulled from a planning document that the government had been working on with KBR (R4, tab 3 at 97-98; tr. 1/48-49). Subsequently, Mod. No. 14 did contain those paragraphs (see finding 36).

SOW as a result of the LOTD; or that KBR contemporaneously questioned Lt Col Blaine's authority to issue the LOTD.

15. LOTDs were the vehicles the government frequently used to provide direction, including planning data, to KBR for in-scope contract requirements. They were fairly commonly used under IDIQ contracts to adjust the level of service expected or provided. Lt Col Blaine testified that, as ACO, he was authorized to issue LOTDs. (Tr. 1/26, 31) He could issue direction within the contract's scope but could not modify that scope. Formal modifications had to come from the PCO. (Tr. 1/47, 67)

16. Once Lt Col Blaine issued an LOTD, his ACOs in the field "worked these issues" for him (tr. 1/34). His expectation was that an LOTD would be carried out, unless there were questions. As he described it, "that was the precedent. That was the way that we worked. In order to achieve a lot of the things we were achieving that was the structure that we used." (Tr. 1/35) The LOTD would issue and it would be executed unless there were questions. If there were questions or challenges, he was in almost daily contact with his ACOs, including MAJ McCaa, and believed he would have heard something through the LOGCAP cell or the ACO involved. He also had very close daily contact with KBR, including with James Ray, Craig McGuiness, and John Reddy. He did not recall anyone from KBR asking him about the implementation of the February LOTD. (Tr. 1/35-36, 67-68, 82-83)

17. As Lt Col Blaine described:

> We also had a KBR planning cell, a leadership echelon, at Camp Victory who we met with daily. Mr. James Ray, Mr. Craig McGuiness, we met with them daily and had many, many discussion[s] on...the issues, the challenges of performing the work that was on contract, as well as the emerging requirements that we were reviewing, primarily driven from the transition from [OIF 1 to OIF 2].

(Tr. 1/25) There was a lot of concern about the transition from OIF 1 to OIF 2. According to Lt Col Blaine, BG West had mentioned that it was "likely to be the most challenging logistical maneuver in military history" (tr. 1/28). In Lt Col Blaine's view,

> [The February LOTD] would not have caught [KBR] cold. This would have been provided to likely James Ray based upon what was weeks, perhaps months, of preparatory discussions about this.
>
> And it would have [been] shared with them that, based upon the likelihood bed-down concept of the incoming unit,

9

there would be some increases in feeding data at certain sites and some decrement at others.

(Tr. 1/30)

18. MAJ McCaa testified that when she received the February LOTD, she gave a copy to Gerald Warner, who was KBR's project manager for the Mosul area (*see, e.g.,* R4, tab 17 at 447; tr. 1/84, 88, 2/62). MAJ McCaa discussed food quality at the DFAC sites with Mr. Warner but never discussed headcounts with him. She visited site H-3 but not too often due to the dangers of travelling in the violent conditions then prevalent in Iraq. (*See* tr. 1/82)

19. Executing LOTDs was Mr. Warner's "number one priority" (tr. 2/65). His testimony about whether he received the February LOTD was equivocal, but he ultimately testified that he was sure that he had received it (tr. 2/65-66, 69). This is supported by MAJ McCaa's testimony that he asked her when the LOTD was to become effective—i.e., when the headcounts were going to decrease or increase—and that she believes she told him that "we have to wait until we get further clarification [from Lt Col Blaine]" (tr. 1/86). Mr. Warner testified that she did not get back to him on this issue before he left in May 2004. There is no testimony or other evidence that Mr. Warner ever attempted to follow up with MAJ McCaa or that he inquired of Lt Col Blaine about the February LOTD, as it directed regarding questions.

20. KBR's DFAC operations team used a requisition package to transmit headcount information pertaining to subcontract requirements. It would include the subcontract scope of work, which would include the headcount requirement. (Tr. 2/95) Mr. Warner was not aware of any KBR requisition package issued to its procurement department directing them to use the 1,422 figure for site H-3 (tr. 2/67-68). Mr. Warner was not involved with KBR's subcontracts but he attributed the lack of a requisition package from KBR to its still being in the process of determining what path to take. In testimony apparently based upon hearsay, which weakened its import, he stated that there were a lot of different sources of information about the status of site H-3, once listed as an enduring site, and who would be located there. This involved different changing numbers, including the new number 1,422. (Tr. 2/68-71)

21. Mr. Warner had no question about the validity of the February LOTD. He just sought clarification. He never received any direction from the government to provide for a different headcount at site H-3 than 1,422. (Tr. 2/70-71) When asked by government counsel whether KBR "could simply disregard the direction of the LOTD without consulting with the government," Mr. Warner responded: "No, ma'am, absolutely not" (tr. 2/73).

10

22. By email of 22 February 2004, Roy I. Maggard II, identified as "Area Operations Manager, H Sites" for KBR's LOGCAP III contract[9] and located at the same Mosul Airfield as MAJ McCaa until July 2004 (tr. 1/93, 2/76-77), asked her:

> [C]an you send me the LTD's from Dec till now or just any that are outstanding. With that I will start tracking on [them and] ensuring they get accomplished and will keep you more informed of the status on each.

(R4, tab 17 at 444) MAJ McCaa testified that she gave Mr. Maggard "the LOTDS that I had," but she did not provide him with the February LOTD (tr. 1/92). Her alleged reasoning was:

> A I did not give him [the February LOTD] because in my opinion they already had it.
>
> Q And why did you think they already had it?
>
> A Because from the email I had...James Ray was on there.
>
> Q And who is James Ray?
>
> A ...He works for KBR. So, he would give things down to Gerald Warner.
>
> And Gerald would discuss it and say, well, I received this. Is this true?

(Tr. 1/92-93) In context, we infer that the email MAJ McCaa referred to was Lt Col Blaine's February LOTD to Mr. Ray and others. MAJ McCaa's testimony concerning her reason for not providing the February LOTD to Mr. Maggard in response to his request for outstanding LOTDs was not particularly persuasive and differs from her prior testimony that she gave the February LOTD to Mr. Warner directly (finding 18). Regardless, she also pointed out that she had referenced the February LOTD in LOTDs she had issued herself, such as a 23 February 2004 LOTD to Mr. Warner (finding 24; app. supp. R4, tab 43 at 1896; tr. 1/99).

23. Mr. Maggard's job as KBR's operations manager for the H sites was to track KBR's requirements and services. He had no responsibility for subcontracts. His job did not relate specifically to headcounts but he received headcount information from time to time, including from any type of government change that issued and from working with the camp mayor. (Tr. 2/77-78, 82, 84) The term "mayor" referred to a camp's commander. Camp

---

[9] Mr. Maggard had a "Halliburton.com" email address.

11

commanders were not COs and had no authority to modify contract requirements or to direct KBR. (Tr. 1/32, 41-43, 100-01) Mr. Maggard acknowledged contemporaneous receipt of the February LOTD, albeit apparently not from MAJ McCaa (tr. 2/79, 81). Thereafter, on a routine site visit to H-3 with MAJ McCaa and others, while there was no discussion about specific headcounts, Mr. Maggard recalled, in testimony reflecting double hearsay, to which we give little weight, that some government personnel told the camp mayor that they had heard that headcounts were increasing rather than decreasing (tr. 2/79-80). Like Mr. Warner, Mr. Maggard was not aware of any KBR requisition package issued to its procurement department directing them to use the 1,422 figure for site H-3. He never asked MAJ McCaa if the February LOTD had been rescinded. Although he did not recall discussing the matter with her, Mr. Maggard did not recall having any concerns about whether the February LOTD should be followed regarding revising the headcounts at the H sites. While he was in Mosul, no KBR official mentioned to him that there was any question about whether the February LOTD was defective. (Tr. 2/82-83, 85)

24. MAJ McCaa issued a subsequent LOTD dated 23 February 2004 to Mr. Warner providing that, in accordance with Lt Col Blaine's February LOTD, KBR was to use the stated planning figures for site H-1 until further notice (app. supp. R4, tab 43 at 1896). The figures were the same as in the February LOTD. MAJ McCaa's LOTD added that "[s]pecifically, KBR is authorized to provide, install and operate and maintain an additional food service facility for H1" (id.). MAJ McCaa did not intend for this LOTD to rescind the February LOTD. It was to clarify the February LOTD. Mr. Warner never inquired of her about her 23 February 2004 LOTD. (Tr. 1/87)

25. DCAA's Iraq Branch Office (IBO) issued a Memorandum for Distribution dated 25 February 2004 on the subject "Early Alert on [KBR] DFAC Subcontracting Practices Relating to [LOGCAP III]." The distribution list covered several DCMA and other offices, and included Lt Col Blaine. The memorandum's focus was upon KBR's use of fixed-price subcontracts and billing methodologies that might not be in the government's best interests. (App. supp. R4, tab 44)

26. In response to DCAA's concerns about subcontract pricing (below), in early 2004 KBR sent Charles Carr, a subcontract administrator and supply chain manager, among other things, to Kuwait to head up a "DFAC Tiger Team" to review KBR's subcontracts for DFAC services in Iraq and Kuwait (tr. 2/87, 88-89, 91-92). KBR tried to arrive at a pricing structure that would accommodate the ability to change the headcount for which the subcontractor would get paid. The team developed a new subcontract format involving pricing bands and different pricing categories within the bands, which it discussed with the PCO and DCAA by conference call in about March 2004. (Tr. 2/92-93) Mr. Carr was not aware of the Tiger Team's ever receiving a KBR requisition to change the headcount at site H-3 to 1,422. Mr. Carr opined that, although he thought it would be difficult, KBR might have been able to negotiate with GCC to lower its price to reflect lower headcounts. He never tried to do so. (Tr. 2/100)

12

27. Regardless of MAJ McCaa's failure to include the February LOTD in response to Mr. Maggard's request for copies of outstanding LOTDs, KBR does not deny that it received the LOTD contemporaneously and we find that it did. This is evident from the hearing testimony cited above and corroborated by the fact that KBR incorporated the revised headcounts for each of the H sites listed in the February LOTD into revised requests for proposals, except for site H-3. By 12 March 2004 KBR had awarded subcontracts, signed by Mr. Carr, for each of the other H sites. They provided for DFAC services for the camp populations listed in the February LOTD. (R4, tab 5; supp. R4, tabs 203-10)

28. On 8 March 2004 Lt Col Blaine emailed "LOTD 04-59-CJTF7-08, (DFAC Planning)" (hereafter the "March LOTD") to KBR's Contract Administrator, Troy Vesper, acting on behalf of Mr. Ray, and to government personnel, including MAJ McCaa (app. supp. R4, tab 49 at 1954-55; tr. 1/36). The LOTD, which referred to the LOGCAP III contract and TO No. 59, appended a 1 March 2004 memorandum which included a spreadsheet of "the new OIF 2 feeding requirement" (app. supp. R4, tab 49 at 1956) at 38 DFAC sites, including the H sites. The memorandum stated:

> 1. CJTF-7 population has shifted and requires an evaluation of current feeding capacities to revise DFAC requirement under [TO] 59. This review of OIF 2 population for each site will need to be validated by the MSC G4 and separate S4 staff. Once validated, adjustment to current LOGCAP services will be changed to meet the requirements. MSC was tasked to highlight unit and permanent population count for both temporary and enduring camps in order to validate feeding requirement for OIF 2.
>
> 2. The following spreadsheet is the new OIF 2 feeding requirement that resulted from FRAGO 288 and will need approval prior to issue to change-LOTD.

(App. supp. R4, tab 49 at 1956) The spreadsheet listed the OIF 2 requirement at site H-3 as 1,422, the same as in the February LOTD (id. at 1957). BG West signed the memorandum as approved (id. at 1956).

29. Lt Col Blaine's March LOTD stated:

> 1. This memo provides information to assist KBR in determining DFAC headcount planning. The attached memo was signed by BG West, CJTF-7 C4. KBR is requested to acknowledge that the numbers provided are an estimate, and that KBR's on-site management staff

13

should continue to coordinate closely with camp mayors to obtain the most accurate current headcount. Only through close coordination with the mayors can KBR ensure they have reasonable estimates for meal preparation, mermite preparation, satellite headcount, and seating needs.

(R4, tab 49 at 1955) The LOTD added that the government believed the action was within the contract's scope and that, as the OIF 2 footprint decreased, and with the advent of the SPV program, the overall estimated contract cost should decrease. The LOTD provided that KBR was to contact Lt Col Blaine if there were questions or concerns. The March LOTD did not rescind the February LOTD. (Tr. 1/88-89)

30. Mr. Carr recalls receiving the February LOTD and believes he saw it in February 2004. He was not concerned whether it should be followed. He did not believe that the March LOTD had any effect upon the February LOTD. (Tr. 2/102-03, 105)

31. There is no evidence that a camp mayor ever purported to direct KBR to change the February or March LOTDs' 1,422 headcount for site H-3 or that KBR ever questioned Lt Col Blaine about the 1,422 headcount for H-3 directed in those LOTDs.

32. The February and March LOTDs did not mention subcontract pricing. Lt Col Blaine and MAJ McCaa did not know anything about KBR's subcontract pricing at the time of the LOTDs. (Tr. 1/59-60, 95)

33. On 10 April 2004, KBR and GCC executed Change Order No. 1 to SK425, due to the SPV program, under which food at DFAC facilities was to be provided by a contractor under direct contract with the government. The change reduced the NTE value of DFAC operations at site H-3 by $3,003,518. Among other things, it revised meal prices to reflect actual days of service and implemented a new pricing structure to correspond with two stated camp population ranges: 4,501-5,500 and 5,501-6,500, referred to by the parties as "headbands." Change Order No. 1 did not provide pricing for or refer to the February and March LOTDs' 1,422 figure for site H-3. The new pricing methodology was applied retroactively to subcontract inception. (R4, tab 6 at 120, 124; app. supp. R4, tab 29, subtab I at 876-79)

34. The average headcount at the DFAC at site H-3 during March 2004 was 812; during April 2004 it was 847; during May 2004 it was 1,119; during June 2004 it was 1,259; for July 2004 through 13 February 2005 it ranged from 1,278 to 1,844; and for 14 February 2005 through 30 April 2005 it ranged from 1,844 to 2,353. KBR, along with the government and GCC, signed rosters showing the actual headcount for each meal at site H-3 during these periods, such that KBR was aware of the actual headcounts. KBR nonetheless paid its

14

subcontractor GCC for a camp population of 5,400 throughout these periods. (Gov't undisputed proposed fact findings (PFF) Nos. 13, 17, 19, 22, 24 with record citations)

35. On or about 24 April 2004 MAJ McCaa and KBR discussed a "Contract Compliance Analysis H-Sites" schedule. MAJ McCaa did not prepare the schedule and she was not sure who had. Section 8.0 of the schedule was entitled "BASE CAMP SUPPORT SERVICES MORE THEN [sic] 1,800 HEAD COUNT." Subsection 8.17 was entitled "DINING FACILITY (DFAC) OPERATIONS: Appendix B." Site H-3 was identified as "In Compliance." MAJ McCaa informed KBR that she agreed with the information in the schedule, including the "In Compliance" reference. (R4, tab 17 at 459-60; tr. 1/90-91) However, she testified that her agreement was not based upon headcounts, but upon food policy. When she was discussing the schedule with KBR, MAJ McCaa did not question the identification of site H-3 as a camp with more than a 1,800 headcount. She did not know the headcounts at the DFACs or the headcounts that KBR was asking its subcontractors to serve and she did not discuss headcounts with anyone at KBR at that time. MAJ McCaa never saw a DFAC subcontract, DFAC subcontract invoice, or KBR invoice. (Tr. 1/91-92, 98)

36. Mod. No. 14, signed and effective on 11 May 2004,[10] incorporated SOW Change 7 V3 into TO No. 59 (R4, tab 7 at 130). Under paragraph 8.17, "DINING FACILITY (DFAC OPERATIONS)," Change 7 stated:

> 8.17.1. The contractor shall provide, install, operate and maintain food service facilities (IAW Appendix B, this SOW) to accommodate the permanent and transient base camp populations, serving 4 meals per day IAW applicable Army regulations and the command's meal cycle for the area.

(*Id.* at 144) The referenced Appendix B gave a headcount of 1,422 for DFAC services at site H-3, the same figure as in the February and March LOTDs (*id.* at 153). Change 7 included a paragraph 8.0, "BASE CAMP SUPPORT SERVICES," which provided that "[u]nless otherwise stated within each paragraph below, the contractor shall establish the following services at all base camps except those that contain permanent party headcounts of less than 1800 personnel (see paragraph 8.20)" (*id.* at 142). The referenced paragraph 8.20, "TEMPORARY BASE CAMPS WITH LESS THAN 1800 PERMANENT HEADCOUNT," provided that "[t]he following services and service scope applies to Temporary Base Camps

---

[10] The SOW Change 7 incorporated into Mod. No. 14 is dated 14 November 2004 (R4, tab 7 at 138). Lt Col Blaine described this a "disconnect" and believed the 11 May 2004 date was correct. He recalled working with the LOGCAP planning cell on the changes in connection with OIF 2 when he was in Iraq. (Tr. 1/54) This is substantiated by the fact that, prior to being incorporated into Mod. No. 14, SOW Change 7 was dated 14 November 2003 (*see* app. supp. R4, tab 33).

in Iraq with a permanent headcount of <u>less than</u> 1800 personnel" (*id.* at 146). The listed services did not include maintenance of a DFAC. Site H-3 was described as "No Longer Enduring" (*id.* at 151). According to Lt Col Blaine the matters contained in Mod. No. 14 were all discussed in planning meetings with all parties involved. He explained that "enduring camps were those that would get robust facilities and would be beefed up" (tr. 1/56). Non-enduring camps were not there "for the long haul" but, for cost and service efficiency reasons, the government did not want to shut down DFACs that were already in existence. An established DFAC would not be torn down but no more "robust services" would be added to it. (Tr. 1/57)

37. KBR issued more change orders to SK425 between June 2004 and 14 March 2005, to add funding and extend performance to 15 June 2005. It did not adjust the DFAC services at site H-3 to apply the 1,422 figure called for by the February and March LOTDs and Mod. No. 14 or adjust or create a headband to accommodate that figure. (R4, tabs 8, 10-11, 13)

38. We find that the weight of the hearing testimony, cited above, not only from Lt Col Blaine and MAJ McCaa, but from KBR's witnesses Messrs. Warner, Maggard and Carr, was that LOTDs were directives by the ACOs to be followed by KBR.

39. There is no contemporaneous written explanation for why KBR did not implement the February LOTD regarding site H-3, which was binding upon it. Even if the LOTD had not been binding, there is no contemporaneous documentary or other evidence that KBR applied reasonable business judgment in failing to follow the LOTD. Well after-the-fact hearing testimony from KBR witnesses Mr. Warner and Mr. Maggard about the allegedly changing status of site H-3, which was diminished by its hearsay nature, was unpersuasive, especially given that KBR did not inquire of Lt Col Blaine about the issue (findings 19-20, 23, 50). We find that KBR's costs incurred in excess of the amount it would have incurred had it complied with the February LOTD were unreasonable.

40. Effective 1 May 2005, ASC issued cost-plus-award-fee TO No. 89, in the amount of $4,972,882,216, to KBR, with performance through 30 April 2006, for DFAC services at several sites, including H-3, where the headcount was listed at 5,000 (R4, tab 12 at 255-56, 290-91).

41. On 10 June 2005 KBR and GCC executed Change Order No. 8 to SK425, which, *inter alia*, funded additional reefer (refrigerator (tr. 2/28)) storage and revised the subcontract's pricing structure, providing monthly rates for a single headcount band of 4,500 to 5,501 (app. supp. R4, tab 29, subtab G at 593-94).

42. KBR paid GCC a total of $33,234,684.74 in SK425 costs; the government paid KBR for all of those costs (R4, tab 15 at 397-98; app. supp. R4, tab 29, subtab I at 774; gov't PFF No. 30).

43. KBR acknowledged in *KBR IV* that it "did not reduce costs to correspond with the reduced headcount planning figure for Site H-3"; fixed pricing for categories and headcount ranges continued through the life of the subcontract; and "SK425's pricing was never based on actual headcounts or the 1422 planning figure of the February 17, 2004 e-mail" (the LOTD). *KBR IV*, 15-1 BCA ¶ 35,988 at 175,816 (Statement of Fact (SOF) ¶ 7).

## DCAA Audits

44. Beginning in or around 2004 the Army, DCMA and DCAA became concerned with KBR's DFAC-related subcontract pricing methodology, including subcontractors' alleged overbilling for headcounts that substantially exceeded the actual populations served. Auditing matters and reports continued into 2011. *See KBR IV*, 15-1 BCA ¶ 35,988 at 175,816 *et seq.*

45. By letter of 12 October 2007, U.S. Senator Claire McCaskill asked the Department of Defense's Chief Financial Officer to respond to concerns expressed to the Senator by James Ransburg. Mr. Ransburg had formerly worked for a consulting company hired by KBR. Beginning in May 2005, he had performed contract analysis and closeout in connection with KBR's OIF work. He alleged that, by the time he departed in August 2005, he had examined a portion of KBR's FY 2004 expired DFAC subcontracts and had found that about 85% of them had been mismanaged, resulting in excess of $50 million in overpayments and funding. He was concerned that this was a systematic problem occurring throughout the DFAC subcontracts for FYs 2003-2006. (App. R4 hearing supp., tab A-11) *See KBR IV*, 15-1 BCA ¶ 35,988 at 175,820, SOF ¶ 33.

46. KBR alleges that DCAA was unduly influenced by Senator McCaskill's letter; was concerned with impressing Mr. Ransburg; and rushed to respond to the issues raised, thus sacrificing independence and impartiality (app. br. at 35-36). We have reviewed the record as a whole, including the portions cited by KBR, and we find that its allegations are not supported by substantial evidence.

47. George Duggan, a senior DCAA auditor, went to Iraq in February 2007 to work on open DFAC audits. He began an audit of SK425 after learning in March 2007 about potential overbilling under another subcontract from a KBR subcontract manager who referred him to Mr. Ransburg. *See KBR IV*, 15-1 BCA ¶ 35,988 at 175,820, SOF ¶ 33. By email of 5 November 2007 to DCAA IBO auditor James Minic, Mr. Duggan stated that Mr. Minic needed to look out for LOTDs in KBR's subcontract files "because if the government directs [KBR] to adjust its SOW headcounts down and they do not, then there exists a good chance that the subcontractor over-billed" (app. R4 hearing supp., tab A-25 at 5602). Mr. Duggan also noted that he had asked DCAA management in May 2007 to get the DCMA Commander at Camp Victory "to explain more completely what an LOTD means – is it suggestive or mandatory?" but he had not yet had a response (*id.*).

48. On 16 November 2007 DCAA's IBO issued a draft Statement of Condition and Recommendation (SOCAR) to KBR, which reported that KBR had overbilled the government for SK425 under TO No. 59, in 2004 and 2005 in the total amount of $11,990,181, contrary to the Allowable Cost and Payment clause and FAR 31.201-3, Determining reasonableness (R4, tab 14 at 388). The draft SOCAR stated in part:

> Actual average monthly headcounts recorded for DFAC services from the beginning of the subcontract, in February 2004, through June 2005 were all below the [SOW] headcount of 5,000, with the highest count at 2,647 and the lowest at 812. For all but two of the seventeen months of the subcontract period of performance the subcontract pricing table did not include lower headcount bands that would have accommodated the actual lower monthly headcounts. Nor did [KBR] revise the subcontract pricing tables until subcontract change order no. 6, dated March 15, 2005. Yet, according to [consultant Ransburg], as stated in his subcontract analysis memorandum, dated June 19, 2006, [the February LOTD] directed [KBR] to use 1,422 as the average headcount for this subcontract.

> ....

> [KBR] should comply with the FAR cites identified above and issue a credit to the government for the amounts of unreasonable costs explicated above and detailed in the attached schedules.

(R4, tab 14 at 389) DCAA IBO calculated the questioned costs by using two government-created headcount bands of 500 to 1,500 and 1,501 to 2,500 (id.; app. undisputed PFF No. 37). The reported average headcounts from 14 February 2004 through April 2005, prior to TO No. 89, ranged from 812 to 2,339 (R4, tab 14 at 390-94).

49. By letter of 9 July 2008, KBR notified Kristan Mendoza, PCO at ASC, of a billing adjustment under SK425, affecting TO Nos. 59 and 89 and resulting in a $9,406,108.34 credit to the government. KBR reported that it had billed $33,234,684.74 to the government, when it should have billed $23,828,576.40 in light of the February LOTD. (R4, tab 15 at 396-97) Of the $9,406,108.34 credit, $8,953,783.34 applied to TO No. 59 and $452,325.00 applied to TO No. 89 (id. at 401). KBR's letter and attachments contained billing and credit calculations. KBR stated that it had advised ASC, DCMA and DCAA in late 2007 that it had initiated a review of DFAC subcontracts in Iraq due to questions DCAA

18

had raised in various requests and reports and the credit was the result of KBR's analysis (*id.* at 397). KBR explained and qualified the credit as follows:

> On February 17, 2004, DCMA Northern Iraq issued [an LOTD] that reduced the estimated headcount (HC) for dining facility services at site H-3.... KBR inadvertently did not consider the impact [of] this LOTD in the context of unique language in [SK425], which allowed KBR to reduce the monthly price for labor and equipment when a sustained HC reduction occurred. Similarly, KBR negotiated prices for consumables and support services (sewage and garbage), which were added to [SK425] after the LOTD had been issued, based upon the initial HC estimate. The adjustment in billings equals what [SK425] prices should have been for labor, equipment, consumables and support services as a result of the LOTD.
>
> KBR's review to date supports the appropriateness of a credit in the amount identified above. KBR, however, has not completed its review of all relevant facts. Should the review uncover facts that reveal that no credit is required or that the amount identified above is too high or too low, KBR reserves the right to either eliminate the credit or to adjust the amount of the credit.

(*Id.*) KBR explained in support of its credit that it had awarded SK425 to GCC on 8 February 2004 based upon an estimated headcount of 5,400 at site H-3. The subcontract provided that labor and equipment prices were subject to adjustment for a "sustained increase or decrease" in headcount, but after DCMA issued the February LOTD reducing the headcount for site H-3 to 1,422, KBR did not exercise its contractual right to reduce those prices. Moreover, when it negotiated Change Order No. 1 to the subcontract, effective 10 April 2004, new provisions for consumable and support services were priced based upon the original 5,400 headcount and not the LOTD's 1,422 headcount. KBR stated that it had not substantiated that its lack of adjustment to the February LOTD was in accord with "reasonable business judgment" and, until it did, it was crediting the government with any amounts that could not be justified. (*Id.* at 398)

50. Despite KBR's use of the term "inadvertent" in its credit letter to the government, KBR never substantiated that its failure to follow the February LOTD was a mistake. It also never substantiated that it was an exercise in reasonable business judgment. The after-the-fact hearsay testimony of Messrs. Warner and Maggard implied that KBR decided not to follow the February LOTD based upon the government's alleged shifting considerations regarding site H-3. We give this testimony, uncorroborated by any

19

contemporaneous or documented evidence, little weight. While we recognize that populations at various sites did shift during the wartime environment, which was challenging, after the February LOTD issued, the government repeatedly gave 1,422 as the population figure KBR was to use regarding that site (findings 28-29, 36). Further, KBR never inquired of Lt Col Blaine about the February LOTD, which the LOTD had directed it to do in case of questions (findings 14, 39).

51. DCAA's IBO issued an assist audit report on 29 September 2008 on KBR's FYs 2004 and 2005 DFAC procurements under LOGCAP III, TO Nos. 59 and 89, and SK425. It found that some subcontract costs were billed, and KBR paid, for headcounts exceeding actual headcounts that used DFAC services. (R4, tab 16 at 402-03) The stated significant issues with subcontract billings were that (1) KBR overpaid for DFAC services because GCC billed using prices and headcount bands that did not comport with the actual number of personnel using the DFAC services and (2) KBR did not include headcount bands in its DFAC subcontract pricing schedules that would have covered the lower monthly headcounts actually experienced (*id.* at 403-04). DCAA found that KBR was billed $12,202,051 for SK425 costs that were not billed in accordance with subcontract terms, as required by FAR 31.201-2, Determining allowability, and for other costs that were unreasonable, as defined in FAR 31.201-3, Determining reasonableness. DCAA stated that "[o]ur review of the contractor's methodology to compute the [$9,406,108 credit to the government] disclosed that it uses the same basic methodology that we used and essentially confirms the majority of our questioned cost." (*Id.* at 405) DCAA concluded that the major difference between KBR's $9.4 million credit and DCAA's $12.2 million computation was that KBR developed new headcount bands solely for the purpose of computing the credit, but that actual billings had been based upon multiplying the unit price for the particular cost category (e.g., labor, equipment, etc.) by the highest headcount in the applicable range in the subcontract's pricing schedule, 4,501-5,500, regardless of the actual headcount (*id.* at 405, 408). DCAA also questioned consumable and sewage/garbage prices as unreasonable because KBR paid the prices for a headband of 4,501-5,500 despite lower average headcounts (*id.* at 409, 412-13). For consumables, power generation, reefers, and sewage and garbage, DCAA applied "regression analysis" using SK425's pricing tables to determine what it considered to be a more representative headcount band range (*id.* at 409, 414-15; app. R4 hearing supp., tab A-28 at 5829-51, 5884; tr. 2/23-26; *see* R4, tab 6 at 124). The audit report did not address potential GCC demobilization costs that KBR might have incurred had the scope of SK425 been reduced in the spring of 2004. Those costs were charged separately by GCC. (Tr. 2/52)

52. The 2008 assist audit report did not rely upon or mention the February or March LOTDs. According to DCAA regional audit manager Joann Niebruegge, who signed the report, at the time the report was issued her audit team did not have an LOTD. The audit does not address the requirements of TO Nos. 59 and 89. (R4, tab 16 at 416; tr. 2/8, 30)

20

53. By letter to CO Mendoza dated 11 February 2010 on the first page and 19 February 2010 on all subsequent pages, KBR submitted a CDA claim, certified on 19 February 2010, to recover its $9,406,108.34 credit, plus interest (R4, tab 17 at 420-32). It asserted that it was entitled to reimbursement for its reasonable, allowable, and allocable LOGCAP III costs under the contract's Allowable Cost and Payment clause. KBR contended that, upon further review, its failure to reduce the headcount capacity at site H-3 under its subcontract was consistent with reasonable business judgment. KBR stated that, when SK425 was awarded, the SOW then in force specified a headcount at site H-3 of 6,500 plus a satellite DFAC for 800 and that, under TO No. 59, KBR had to be ready to meet headcount surges. KBR contended that, while Change Order No. 1 to SK425 was effective on 10 April 2004, which was after the February LOTD, the LOTD had described the 1,422 headcount as a planning figure. KBR alleged that, during the transition from OIF 1 to OIF 2, the government had issued conflicting directions regarding headcount requirements at Iraqi sites; the March LOTD effectively rescinded the February LOTD; and KBR was now directed to obtain its DFAC headcounts from camp mayors. (R4, tab 17 at 422) KBR stated that there had been no formal change to TO No. 59's headcount as of 10 April 2004 causing an uncertainty that required KBR to exercise business judgment and rendering SK425's Change Order No. 1 price reasonable. KBR claimed that, as of 24 April 2004, the H site ACO (MAJ McCaa) had confirmed that it was providing DFAC services in accordance with TO No. 59's SOW. The contractor further alleged that, beginning in March 2004 and continuing through the end of SK425, site H-3's maximum average daily headcount grew from 812 in March 2004 to 2,647 in June 2005 and that, as of April 2005, TO No. 89's SOW contained a headcount of 5,000. Thus, the trend was upward despite the February LOTD. KBR also raised a number of alleged problems with modifying its subcontract and contended that there would be little practical or cost benefit to the government in doing so. Lastly, KBR alleged that its subcontractor costs were reasonable because they did not result from gross disregard of its requirements under the LOGCAP III contract. Rather, even if the H-3 headcount and SK425 price should have been adjusted downward, KBR's subcontract administrators had simply made a mistake in failing to do so.

54. By letter to KBR of 18 June 2010, ACO Antonio James stated that KBR had advised him that it intended to bill for the claimed amount. He stated that he concurred with this process, it should resolve the claim, and he would defer issuing a final decision. (App. supp. R4, tab 78 at 2352) On 29 July 2010 KBR submitted vouchers for the amount of the withdrawn credit, which the government approved on about 10 August 2010. It applied the amount against alleged KBR debts to the government. (*See* R4, tabs 19-20)

55. On 26 August 2010 KBR advised the ACO that it was treating the government's acceptance of its vouchers as a final determination that it was entitled to the $9,406,108.34 claimed amount and, if its understanding were correct, it would forego its interest claim (R4, tab 20). On 6 October 2010 the ACO responded that the government had made no determination regarding the allowability of SK425 costs submitted; it disavowed any representation that payment of KBR's interim voucher was a final determination that it was

entitled to the amount paid; and "[s]ubject to...completion of audits and reviews," the government believed that payment of that amount resolved KBR's request for interim payment (R4, tab 21).

56. On 28 April 2011 DCAA's KBR Resident Office in Houston, Texas, issued an audit report on costs incurred under SK425, and TO Nos. 59 and 89, for FYs 2004-06, which incorporated the IBO's assist audit report's findings. DCAA questioned a total of $12,202,051. Of that amount, DCAA questioned $11,636,551 as unreasonable on the ground that KBR billed using headcount band pricing that did not represent actual headcounts. For consumables, sewage and garbage, DCAA used regression analysis to determine a reasonable estimate for pricing actual headcounts. It stated that KBR had not incorporated into SK425 lower headcount bands proposed by GCC for the initial period, which better represented the actual headcount served. DCAA also questioned $565,500 as unallowable because GCC was paid monthly costs at a higher amount than the subcontract specified. (R4, tab 23 at 499-500, 503-04; tr. 2/23-27) The auditors stated:

> [KBR] contends its actions in not reducing headcount capacity under the subcontract were consistent with reasonable business judgment. We disagree with [KBR's] position based on the contractor being directed in [the February LOTD] by the Government to adjust its level of service based on the reduction of headcounts. This instruction was ignored which resulted in the Government being overbilled.

(R4, tab 23 at 509)

57. On 3 May 2011 DCAA issued a Form 1 Notice No. 172 to KBR disapproving payment of $12,415,060 ($11,835,578 for TO No. 59 and $579,482 for TO No. 89) (R4, tab 24 at 525). The Form 1 was based upon the disapproved SK425 costs of $12,202,051, plus indirect costs based upon interim indirect cost rates, less private security costs disapproved by a separate Form 1, plus fee (*id.* at 527, 533).

58. By final decision of 22 March 2012, ACO James determined that $12,179,846 in KBR's billed SK425 DFAC costs at site H-3 were unallowable, citing DCAA's 28 April 2011 audit report and its Form 1. He stated that the decision was "based on KBR's failure to reduce the H-3 DFAC headcount as directed by the LOTD dated February 17, 2004" and that "[c]osts incurred for services exceeding the services required by the ACO are unreasonable, and therefore unallowable." (R4, tab 28 at 542, 544) The decision also stated that it resolved KBR's 19 February 2010 claim; the government had properly withheld KBR's voluntary credit; and KBR's claim for interest was denied. The ACO allowed $235,214 of DCAA's questioned costs from 13-17 February 2004, based upon the time

between "contract inception"[11] and KBR's receipt of the February LOTD, and from 18-27 February 2004, accounting for the 10-day period KBR was allowed under SK425 to implement changes (*id.* at 542). The final decision demanded payment by KBR of $11,483,487.74 (the disallowed $12,179,846 less $696,358.26 previously withheld) (*id.* at 545). KBR timely appealed to the Board on 19 June 2012.

59. ACO James acknowledged that his final decision was based upon KBR's failure to follow the February LOTD, thereby incurring unreasonable subcontract costs, whereas DCAA questioned billed costs versus actual costs. In preparing his final decision, ACO James did not ask DCAA to quantify the impact of KBR's failure to follow the LOTD, i.e., to analyze what KBR's incurred costs would have been had it re-priced SK425 to reflect the February LOTD's headcount figure for site H-3. (Tr. 1/135; app. PFF No. 48)

60. DCMA raised at the hearing, and ACO James testified, that the costs he disallowed in his final decision that pertained to TO No. 89 should not have been disallowed, because that TO set services at site H-3 for a headcount of 5,000 (tr. 1/127). After crediting private security costs, ACO James had disallowed $555,434 in costs, plus overhead, general and administrative costs, facilities capital cost of money, and base fee, for a total disallowed amount pertaining to TO No. 89 of $579,482 (R4, tab 28 at 544).

61. DCMA now contends that KBR was overpaid by $11,929,475 ($11,752,671 plus indirect costs and fee). Taking into account the government's withheld amount of $696,358.26, DCMA now claims that KBR owes the government $11,233,117 ($11,929,475 - $696,358.26) for unreasonable and unallowable costs the government paid to KBR pertaining to SK425, plus CDA interest as of 22 March 2012. (Gov't br. at 48-50; gov't reply br. at 32)

## DISCUSSION

### The Parties' Contentions

DCMA alleges that KBR has not met its burden to prove that its DFAC costs were reasonable under FAR 31.201-3(a) (*see* finding 3). DCMA contends that KBR did not act as a prudent person in the conduct of competitive business when it incurred subcontract costs for DFAC services at site H-3 for a camp population of 5,400 after Lt Col Blaine had directed in the February LOTD that KBR provide DFAC services at that site for a population of 1,422; KBR in effect ignored the LOTD with regard to site H-3; and it did not consider the LOTD's impact upon SK425. DCMA denies KBR's allegation (below) that Lt Col Blaine lacked authority to issue the LOTD. DCMA also contends, contrary to

---

[11] The reference to a 13 February 2004 "contract inception" is unclear. We infer that it refers to SK425, which was effective on 14 February 2004 (finding 9).

KBR's allegation, that the $11,233,117 DCMA seeks represents a disallowance of unreasonable costs, not damages. DCMA asserts that:

> [T]he amount of KBR's reasonable costs for SK00425 should be limited to the amount of DFAC costs that KBR would have incurred if it had adopted the headcount specified in the February LOTD for Site H-3, or the DFAC costs for headcounts that were actually served, if higher than the amount specified in the LOTD. KBR provided no basis for calculating this amount or, for that matter, any basis for calculating an alternate amount other than the full costs that it paid GCC. In that vacuum, the Government's estimation of the reasonable costs should be adopted.

(Gov't reply br. at 32)

KBR contends that the February and March LOTDs were planning documents, not binding contract modifications requiring KBR to reprice SK425 using the 1,422 headcount. If they were intended to be contract modifications, then Lt Col Blaine lacked authority to issue them. KBR also alleges that the standard for assessing cost reasonableness is flexible and depends upon the context in which the costs were incurred. It asserts that it reasonably priced SK425 under the totality of the circumstances, including the wartime environment, TO No. 59's requirements, conflicting information regarding projected headcounts at site H-3, DCMA's failure to provide clear guidance regarding that information, and government pressure for KBR to move to a new pricing structure. KBR alleges that "[f]aced with these circumstances in April 2004, KBR reasonably established headcount band pricing for SK425 in accordance with the then-existing minimum requirements of [TO No. 59]" (app. br. at 21). KBR also claims that costs can be reasonable even if incurred due to a contractor's simple error, absent gross disregard of the contractor's contractual obligations. KBR also alleges that DCMA has not proved damages with reasonable certainty. KBR contends that the government's cost calculation is inconsistent with its liability theory as expressed in the ACO's 22 March 2012 final decision and is based upon flawed DCAA audits that lacked independence and adequate evidentiary support.

### Lt Col Blaine Had Authority to Issue the February and March LOTDs

We begin with KBR's contention that Lt Col Blaine lacked the authority to issue the February and March LOTDs. The PCO delegated ACO authority to DCMA's Command-San Antonio, which sub-delegated it to DCMA Middle East. In accordance with FAR Subpart 1.6 and FAR 42.302, Lt Col Blaine was appointed to be a CO and an ACO on 4 January 2004. He also served as Commander, DCMA Northern Iraq. Under TO No. 59's SOW paragraph 1.4, unless otherwise specified, all SOW increases, decreases or modifications were to be directed by the ACO. While Lt Col Blaine's delegated authority

excluded taking any action that involved changing TO No. 59's value or the contract's performance period, the February and March LOTDs stated that the government believed they were within the contract's scope; the cost impact should be minimal as services were reallocated from shrinking sites; KBR was to contact Lt Col Blaine for contractual questions; and KBR was to submit any increase or decrease in its original estimated cost and any suggested changes to the SOW. There is no evidence that KBR ever contacted Lt Col Blaine with questions about the LOTDs; or suggested that he did not have authority to issue them; or that they were not within TO No. 59's scope; or that they changed TO No. 59's value; or that KBR submitted any increase or decrease in its estimated costs or proposed changes to the SOW as a result of the LOTDs. (Findings 7-8, 11-12, 14, 19, 50)

The government frequently used LOTDs to provide direction, including planning data, to KBR for in-scope contract requirements. They were fairly commonly used under IDIQ contracts to adjust the level of service expected or provided. Lt Col Blaine testified without contradiction that, as ACO, he was authorized to issue LOTDs. He could issue directions within the contract's scope but could not modify that scope. Formal modifications had to come from the PCO. (Finding 15) Indeed, in *Kellogg Brown & Root Services, Inc. v. United States*, 107 Fed. Cl. 16, 19 (2012) (*KBR I*), aff'd, 742 F.3d 967 (Fed. Cir. 2014) (*KBR III*), which also involved TO No. 59, the parties stipulated, and the court found, that Lt Col Blaine had the "requisite delegated authority" to issue the February LOTD, "altering anticipated camp populations at five H sites."

We find no support for KBR's proposition that Lt Col Blaine lacked the authority to issue the February and March LOTDs, the evidence is to the contrary, and we conclude that he did have the requisite authority.

<u>The February LOTD was Binding upon KBR and KBR</u>
<u>Did Not Exercise Reasonable Business Judgment in Failing to Comply with It</u>

Regarding KBR's contention that the February LOTD was merely a planning document and not binding upon it, in practice KBR treated LOTDs as contractual directives. For example, Mr. Carr, head of KBR's DFAC Tiger Team (finding 26), testified in *KBR I* that change orders to subcontracts regarding headcount bands would be implemented "once [KBR] was directed to change the headcount that was contractually required through an LOTD from the client." 107 Fed. Cl. at 18. Moreover, as reported by the court, KBR also contended in that case that it did not have the discretion to alter its subcontracted headcount capacity at a particular site on its own and that "[o]nly the cognizant ACO possessed the authority to alter the stated capacity requirement through issuance of an LOTD." *Id.* at 32.

Although an LOTD is not an agreement, the principle that "the parties' contemporaneous construction of an agreement, before it has become the subject of a dispute, is entitled to great weight in its interpretation," *Blinderman Construction Co. v. United States*, 695 F.2d 552, 558 (Fed. Cir. 1982), is apt by analogy. We found that the weight of the

25

testimony at the hearing, not only from Lt Col Blaine and MAJ McCaa, but from KBR's witnesses Messrs. Warner, Maggard and Carr, was that LOTDs were directives by the ACOs to be followed by KBR (finding 38). Until the current litigation, KBR did not assert that the February LOTD was not binding upon it. Despite MAJ McCaa's failure to include the February LOTD among those she provided to Mr. Maggard upon his request for outstanding LOTDs, KBR does not deny that it received the LOTD contemporaneously and we found that it did (finding 19). KBR's project manager, Mr. Warner, had no question about the February LOTD's validity and acknowledged that KBR "absolutely" could not simply disregard its direction without consulting with the government, and that he never received any direction from the government to provide for a different headcount at site H-3 than 1,422 (finding 21). MAJ McCaa's 23 February 2004 LOTD and Lt Col Blaine's March LOTD did not rescind the February LOTD (findings 24, 29).

Further, KBR's initial reaction to DCAA's draft November 2007 SOCAR, which asserted that KBR's charged costs were unreasonable concerning site H-3, because it did not comply with the February LOTD's order to reduce the headcount there, was to issue a credit to the government. On 9 July 2008, KBR notified the PCO of a billing adjustment under SK425, affecting TO Nos. 59 and 89, which resulted in a $9,406,108.34 credit to the government. KBR reported that it had billed $33,234,684.74 to the government, when it should have billed $23,828,576.40 in light of the February LOTD. Of the $9,406,108.34 credit, $8,953,783.34 applied to TO No. 59 and $452,325.00 applied to TO No. 89. KBR stated that the credit was qualified based upon further fact development; it had inadvertently failed to consider the February LOTD in the pricing of SK425; it had not billed the government appropriately; and it had not substantiated that its lack of adjustment to account for the February LOTD was in accordance with "reasonable business judgment" and, until it did, it was crediting the government with the amounts that could not be justified. (Finding 49)

As in *KBR III*, "[t]he record here is simply devoid of a contemporary justification supporting a reasonableness finding" regarding KBR's claimed costs. 742 F.3d at 972. There is no contemporaneous written explanation of record for why KBR did not implement the February LOTD regarding site H-3, which was binding upon it. We found that KBR never substantiated that its failure to follow the LOTD was an exercise in reasonable business judgment or that it was a mistake (finding 50). The United States Court of Appeals for the Federal Circuit previously rejected KBR's argument that it is entitled to recover its costs absent gross misconduct on its part. *Kellogg Brown & Root Services v. United States*, 728 F.3d 1348, 1359 (Fed. Cir. 2013) (*KBR II*), accord *KBR III*, 742 F.3d at 971. Moreover the court noted in *KBR III* that a contractor's "business judgment must still be exercised in a rational manner, even in wartime." 742 F.3d at 972. We conclude that KBR's billed DFAC costs for site H-3 that exceeded the amounts that should have been billed had KBR complied with the February LOTD were not reasonable under the contract's Allowable Cost and Payment clause, FAR 52.216-7(a), and FAR 31.201-2(a)(1) and 31.201-3(a) (findings 2-3). KBR is to reimburse DCMA for those costs, plus interest, as set forth below.

26

## Quantum

This appeal encompassed quantum as well as entitlement. Cost reasonableness, which is at issue, is a question of fact. The standard for assessing reasonableness is flexible, allowing a tribunal discretion "to consider many fact-intensive and context-specific factors." *KBR II,* 728 F.3d at 1360, *accord KBR III,* 742 F.3d at 970. There is no presumption of reasonableness. KBR bears the burden to prove that the DFAC costs it billed to the government in connection with site H-3, after KBR's receipt of the February LOTD, were reasonable. *KBR III,* 742 F.3d at 970; FAR 31-201-3(a). Contrary to KBR's contention, DCMA does not bear a burden of proof regarding damages, which are not at issue. This appeal involves a government claim to recover unallowable costs.

"A cost is reasonable if, in its nature and amount, it does not exceed that which would be incurred by a prudent person in the conduct of competitive business" (finding 3, FAR 31-201-3(a)). KBR did not have the right to disregard the February LOTD and it was imprudent to do so. The costs KBR incurred due to its failure to reduce the site H-3 headcount in accordance with the LOTD and billed to the government were unreasonable (finding 39). Thus, KBR must reimburse the government for those costs.

KBR contends that DCAA's audits were flawed. We found that its allegations that DCAA was unduly influenced by a letter from Senator McCaskill; DCAA was concerned with impressing KBR's former consultant, Mr. Ransburg; and DCAA rushed to respond to the issues raised, sacrificing independence and impartiality, were not supported by substantial evidence (finding 46). Moreover, while DCAA's assist audit found KBR's subcontract costs billed to the government to be unreasonable on the ground that KBR billed using headcount band pricing that did not represent actual headcounts, the 28 April 2011 Resident Office's audit concluded that KBR's ignoring the February LOTD's direction to adjust its level of service based on reduced headcounts was not consistent with reasonable business judgment and had resulted in the government being overbilled. (Findings 51, 56) Similarly, the ACO's final decision on appeal focused upon the difference in costs KBR would have billed to the government had KBR reduced the site H-3 headcount in accordance with the February LOTD and the costs it actually billed to the government (finding 58 ). Regardless, when a CO's final decision is appealed, we conduct *de novo* proceedings. *Wilner v. United States,* 24 F.3d 1397, 1401-02 (Fed. Cir. 1994).

KBR asks the Board to deny the government's claim and rule that KBR is entitled to the full amount challenged by the government, including the amount the government has already recouped. KBR disputes DCMA's legal arguments that KBR's SK425 costs in contention were unreasonable and that the government was entitled to recoup those costs, and it disputes DCAA's independence and approach. However, KBR made no effort to challenge the factual basis of DCMA's quantum calculations and did not advance any quantum calculation of its own at the hearing. The only quantum calculations from KBR,

which it did not elaborate upon at the hearing, are those supporting its initial credit to DCMA for KBR's failure to follow the February LOTD, which resulted in a $8,953,783.34 credit regarding TO No. 59, the only TO now at issue. DCAA concluded that, with some exceptions, KBR had followed the same methodology as DCAA in reaching the amount credited. (Findings 49, 51)

The weight of the evidence on the record before us supports DCMA's quantum calculations. Moreover, DCMA allowed for an equitable credit to KBR if the actual population at site H-3 exceeded the February LOTD's figure of 1,422. Therefore, we conclude that the government is entitled to $11,233,117 (rounded) ($11,929,475.00 less the $696,358.26 it has already withheld), plus interest as of 22 March 2012, the date of the CO's final decision demanding payment from KBR, computed in accordance with the contract's Interest clause (finding 4).[12]

## DECISION

KBR's appeal is denied. DCMA's claim is sustained. KBR is to remit $11,233,117 to the government, plus interest as of 22 March 2012, computed under the contract's Interest clause.

Dated: 15 March 2018

CHERYL L. SCOTT
Administrative Judge
Armed Services Board
of Contract Appeals

I concur

RICHARD SHACKLEFORD
Administrative Judge
Acting Chairman
Armed Services Board
of Contract Appeals

I concur

OWEN C. WILSON
Administrative Judge
Vice Chairman
Armed Services Board
of Contract Appeals

---

[12] DCMA sought CDA interest. The CDA does not provide for the payment of interest to the government. However, interest payable to the government under the contract's Interest clause is based upon CDA interest.

I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals in ASBCA No. 58175, Appeal of Kellogg Brown & Root Services, Inc., rendered in conformance with the Board's Charter.

Dated:

JEFFREY D. GARDIN
Recorder, Armed Services
Board of Contract Appeals